**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

KATHLEEN HUNT, as Personal Representative
of the ESTATE OF GEORGE ARTHUR HUNT, IV,
            Plaintiff,

                                    Case   No: 8:15-cv-1257-T-33EAJ

vs.

BOB GUALTIERI, in his capacity as Pinellas
County Sheriff; MARIA CRUZ, SHAWN FOX;
GARY PAXSON; AND MAXIM PHYSICIAN
RESOURCES, LLC,
            Defendants.
_____/

**AMENDED COMPLAINT**

      Plaintiff, KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE

ARTHUR HUNT, IV, by and through the undersigned attorneys, sues the Defendants, BOB

GUALTIERI, in his capacity as Pinellas County Sheriff; MARIA CRUZ, SHAWN FOX; MAXIM

PHYSICIAN RESOURCES, LLC, and LUIS A. QUINONES, M.D. and states:

**PRELIMINARY STATEMENT**

      This is a medical malpractice action pursuant to Florida Statute 766.102, a tort action

pursuant to Florida Statute 768.28, and a Civil Rights action in which Plaintiff seeks relief for

Defendants' violations of rights secured by the Civil Rights Act of 1971, 42 U.S.C. § 1983, the

Fourteenth Amendment to the Constitution of the United States and the Constitution and laws of

the State of Florida. Plaintiff seeks compensatory damages in an amount in excess of fifteen

thousand dollars ($15,000.00), an award of costs, interest and attorney's fees, pursuant to 42

U.S.C. 1988,  and such other and further relief as this Honorable Court deems just and proper.

## JURISDICTION AND VENUE

1.      This is an action for damages in excess of Fifteen Thousand Dollars ($15,000.00), exclusive of costs.

2.      This Honorable Court has jurisdiction pursuant to Article V § 5 of the Florida Constitution and Florida Statute 26.012.

3.      Venue is proper in Pinellas County, Florida as the acts and omissions about which Plaintiff complains occurred within Pinellas County, Florida and, as is more fully set forth below, the Plaintiff, the Decedent and one or more of the Defendants, including the Defendant, BOB GUALTIERI (hereinafter "DEFENDANT GUALTIERI"), were at all times relevant to this cause, residents of Pinellas County, Florida.

4.      On or about December 16, 2013, within 2 years of this action accruing, Plaintiff provided a Notice of Claim, a Demand for Compensation for injury, and a Demand for Compensation for Wrongful Death in writing to DEFENDANT GUALTIERI of the Pinellas County Sheriff's Office, and the Florida Department of Financial Services.

5.      On or about August 5, 2014, Plaintiff filed with the Clerk of the Circuit Court, Pinellas County, Florida, a Petition for Automatic 90 Day Extension of the Statute of Limitations pursuant to Florida Statute §766.104(2) (Exhibit "A").

6.      Plaintiff has complied with the medical malpractice pre-suit requirements found in Florida's Medical Malpractice Statute including serving pre-suit notices of intent on DEFENDANT GUALTIERI, Defendant Nurse Maria Cruz, and Nurse Christina Kalicharan on or about August 26, 2014.

7.      Such pre-suit notices of intent were sufficient to provide notice to Defendants, Maxim Physician Resources, LLC and Luis A. Quinones, as they had legal relationships

pursuant to Fla. R. Civ. P. 1.650(b)(1) with DEFENDANT GUALTIERI at all times relevant herein.

8.      The pre-suit period with the notices of intent described in paragraph 6 above was extended by stipulation on multiple occasions, ultimately ending on January 23, 2015.

9.      Plaintiff, KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV, has conducted a good faith investigation with her Certificate of Good Faith attached hereto as Exhibit "B."

10.     All conditions precedent to the maintenance of this suit, including compliance with the provisions of Fla. Stat. as forth in Sec. 766.106 and Sec. 768.28, have been satisfied.

## PARTIES

11.     Plaintiff is, and at all times relevant to this action has been, a resident of Pinellas County, Florida.

12.     Plaintiff, KATHLEEN HUNT, has been duly appointed Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV, (hereinafter "ESTATE") and has the authority to bring this action on behalf of the ESTATE and all survivors under Florida's Wrongful Death Statute pursuant to an Order Appointing Personal Representative, a copy of which is attached as Exhibit "C."

13.     At the time of his death and for a number of years prior thereto, George Arthur Hunt IV, (hereinafter "Mr. Hunt" or the "Decedent") was a resident of Pinellas County, Florida.

14.     At all times relevant to this complaint, DEFENDANT GUALTIERI, was the Sheriff of Pinellas County. The acts, omissions and conduct which form the basis of this complaint were taken under color of law and in his capacity as Pinellas County Sheriff.

15.     At all times material herein, Defendant, MARIA CRUZ, (hereinafter

"DEFENDANT CRUZ") was a registered nurse licensed in the state of Florida and is, and was, an agent or employee in the scope and course of her employment with DEFENDANT GUALTIERI, the Pinellas County Sheriff's Office at the Pinellas County Jail.

16.     At all times material herein, Defendant, SHAWN FOX (hereinafter "DEFENDANT FOX"),   was a certified detention deputy pursuant to F. S. 943.13 and 943.1395 and was employed as such by DEFENDANT GUALTIERI in Pinellas County, Florida.

17.     At all times material herein, all employees of the Pinellas County Sheriff's Office named anywhere in this Complaint, including but not limited to Corporal Gary Paxson, Sergeant Scott Holderbaum, Lieutenant Eric Campbell, Nurse Jo Ellen Smith, Nurse Tricia Harrell, Nurse Christina Kalicharan and Deputy Alderman were at all relevant times relevant herein employed by and acting in the course of such employment with DEFENDANT GUALTIERI.

18.     At all times material herein, Defendant, MAXIM PHYSICIAN RESOURCES, LLC (hereinafter "DEFENDANT MAXIM") was a company who entered into a contract with the DEFENDANT GUALTIERI to provide Locum Tenens Providers to the Pinellas County Jail.

19.     At all times material herein, Defendant, Dr. Luis A. Quinones, M.D. (hereinafter "DEFENDANT QUINONES") was a Locum Tenens Physician who provided on call medical services to the Pinellas County Jail pursuant to such contract.

20.     The potential beneficiaries of a recovery for the wrongful death of GEORGE ARTHUR HUNT, IV currently known are as follows:

    a)  KATHLEEN HUNT;

    b)  Emmary Hunt,  a minor child;

    c)  Keaten Hunt, a minor child; and

    d)  The ESTATE OF GEORGE ARTHUR HUNT, IV.

## PRELIMINARY FACTS

21.     On May 18, 2013, Mr. Hunt was observed by Deputy Wayne Zelinsky to be operating a motor vehicle, driving off the right side of the road, and failing to negotiate a turn. As a result, Deputy Zelinsky stopped Mr. Hunt, spoke with him, performed approximately two field sobriety tests and at or about 6:11 P.M. ultimately placed Mr. Hunt under arrest for driving under the influence.

22.     Mr. Hunt was transported to the Sheriff's Office breathalyzer facility and then to the Pinellas County Jail.

23.     Mr. Hunt arrived at the Pinellas County Jail at approximately 8:00 P.M., May 18, 2013.

24.     Jail Surveillance Videos show much of Mr. Hunt's incarceration at the Pinellas County Jail on the night of May 18, 2013 and morning of May 19, 2013 including his initial intake processing, medical screening by DEFENDANT CRUZ, transportation to the Healthcare Building by wheelchair, DEFENDANT FOX and Corporal Paxson placing Mr. Hunt in a bunk in an isolated cell, later being found not conscious, appearing lifeless and life saving procedures eventually were instituted. Such Jail Surveillance Videos located on the DVD attached hereto as Exhibit "D" and incorporated by reference.[1]

25.     At intake, an interview and screening was performed by DEFENDANT CRUZ of

---

[1] The undersigned has been advised that the Pinellas County Jail's Surveillance Videos of Mr. Hunt on the night in question provided by the Pinellas County Sheriff's Office is in a proprietary format VideoSphere Evidence Reviewer. The undersigned employed a specialist to convert it to a format more easily usable by all parties including the Court, but such specialist advised that it was not possible. Accordingly, the undersigned is providing the Surveillance videos in the format they were provided to the Plaintiff. There are 5 "Case Folders" that are located in the "Evidence Files" folder on the attached DVD. The Case Folders are as as follows: Case 22, Case 23, Case 26, Case 34, and Case 39. Each Case folder has between 1 and 20 clips, for a total of 45 different video files. The VideoSphere Evidence Reviewer software is also provided on the DVD. The original version provided by the Pinellas County Sheriff's Office is in the folder titled "EvidenceReviewer." The updated version is located in the folder titled "RuntimeEvidenceReviewer."  Either version can be used to view the videos after selecting the particular case folder and video clip.

the Pinellas County Jail medical staff. At that time Mr. Hunt advised DEFENDANT CRUZ that he was under a physician's care, and had been told he suffered liver problems. He also stated that he had started to become yellow about a week before.

26.     Nurse Kalicharan was the nursing supervisor for medical intake the night in question and was consulted with by DEFENDANT CRUZ regarding Mr. Hunt's medical condition.

27.     DEFENDANT CRUZ described Mr. Hunt as having "very obvious" yellow coloring with jaundice and a tongue strawberry in color.  Her screening notes describe Mr. Hunt as having "generalized jaundice from head to toe."

28.     Despite the fact that Mr. Hunt was so thoroughly and profoundly jaundiced that it was noticed and commented upon by the arresting deputy and other Sheriff's office personnel who were not members of the medical staff, and despite being aware of the duration and severity of Mr. Hunt's jaundiced condition, and despite determining that Mr. Hunt should be assigned medical housing and isolated from contact with others, DEFENDANT CRUZ and Nurse Kalicharan cleared him for admission to the jail rather than for transport to a medical facility.

29.     Although Mr. Hunt had no difficulty walking upon his admission to the jail, a fact known by both DEFENDANT FOX and DEFENDANT CRUZ, at some point shortly after his admission to the jail, he was described by DEFENDANT CRUZ as being unsteady on his feet and was provided a wheelchair.

30.     DEFENDANT FOX observed Mr. Hunt at or near the time Mr. Hunt came into the facility. DEFENDANT FOX described his appearance as extreme yellow discoloration – the worst he had ever seen. As DEFENDANT FOX had served in the Detention and Corrections Bureau of the Sheriff's Office for at least six years prior to Mr. Hunt's death, that he had

occasion to see thousands of inmates, visitors, and other persons having reason to be present in the jail.

31.     Mr. Hunt was medically cleared to enter the jail at approximately 10:30 P.M.

32.      Because of his profound jaundice, it was determined that Mr. Hunt would be housed in the medical unit on contact isolation. Mr. Hunt was placed in a single cell.

33.     Although Mr. Hunt had been ambulatory and articulate when he arrived at the jail, his condition very rapidly and very obviously declined. By the time he was placed in the cell in the medical unit at approximately 10:50 P.M. he was extremely lethargic and unable to move himself from the wheelchair onto the bunk or to assist the deputies in any way in doing so. He had to be physically lifted onto the bunk by detention deputies DEFENDANT FOX and Corporal Paxson. He was uncommunicative, unable to sit upright and was left immobile on the bunk in a supine position.

34.     Mr. Hunt was suffering from an obvious and serious medical condition that required immediate medical intervention at the time he was placed in the cell and that DEFENDANT FOX and Corporal Paxson had knowledge of Mr. Hunt's serious medical condition and that his condition put him at serious risk of great harm. Nonetheless, they knowingly failed to seek medical intervention or to take any action whatsoever in regard to Mr. Hunt.

35.     It was further determined because of his jaundice that Mr. Hunt would be released on his own recognizance to Sunstar EMS, a medical transport service for transport to a hospital emergency room as soon as it was legally possible to release him. This plan was conveyed by Nurse Kalicharan to Nurse Jo Ellen Smith. It was thus apparent to personnel of the corrections facility, including but not limited to DEFENDANT CRUZ, DEFENDANT FOX, Sgt.

Holderbaum, Nurse Smith, and Nurse Kalicharan that Mr. Hunt had a medical condition which, if left unattended would lead to serious harm.

36.     The Plan to release Mr. Hunt described immediately above was to be done in order to avoid medical costs and other costs that would be incurred by DEFENDANT GUALTIERI were Mr. Hunt to be treated by an outside medical facility while still in custody.

37.     From the foregoing, it was thus apparent that the DEFENDANT CRUZ, DEFENDANT FOX, and other members of the medical staff knew Mr. Hunt had a medical condition which, if left unattended, would lead to serious harm.

38.     DEFENDANT CRUZ was sufficiently aware of the severity of Mr. Hunt's condition that at approximately 10:30 P.M., she contacted DEFENDANT QUINONES by telephone concerning Mr. Hunt.

39.     DEFENDANT QUINONES was not on site but was at a remote location. Although DEFENDANT QUINONES had only a limited license to practice medicine, and although he was apparently practicing outside the scope of such license in this instance, he was contracted to provide coverage for inmates during the hours that staff physicians were not on the jail premises. More specifically, on information and belief, DEFENDANT QUINONES was only licensed to practice in an area of critical need for the Florida Department of Corrections under the supervision of its physicians and was never licensed to practice for DEFENDANT MAXIM, DEFENDANT GUALTIERI or at the Pinellas County Jail.

40.     Apparently, DEFENDANT QUINONES was not able to visually observe Mr. Hunt's condition either because there were no facilities or technology available for him to do so or because DEFENDANT CRUZ made no arrangements for DEFENDANT QUINONES to do so. Although DEFENDANT CRUZ spoke with him, DEFENDANT QUINONES stated he did

not recall hearing the extent of Mr. Hunt's jaundice.

41.    In his conversation with DEFENDANT CRUZ, DEFENDANT QUINONES ordered medications for Mr. Hunt and certain medical tests for the following day. DEFENDANT QUINONES directed that he be called back for an update on Mr. Hunt's condition and vital signs in one hour. However, the only other call he received concerning Mr. Hunt was at approximately 3:00 AM, May 19th, 2013 when he was called with the information that Mr. Hunt was dead.

42.    Clearly, the medical staff of the Pinellas County Jail, including DEFENDANT CRUZ, deliberately ignored the orders of DEFENDANT QUINONES to re-check Mr. Hunt at approximately 11:30 P.M. and to contact him with the current status of Mr. Hunt's condition. Rather than following the physician's directions, and while being aware of Mr. Hunt's serious medical condition, DEFENDANT CRUZ ignored Mr. Hunt and did nothing.

43.    Mr. Hunt was observed by one or more employee(s) of the Pinellas County Sheriff's Office by video camera at 11:00 P.M., 11:15 P.M., 11:30 P.M., 11:45 P.M., 12:00 P.M., and 12:15 P.M. believed to include Deputy Alderman while in the medical isolation cell. He is listed as sleeping during those observations.

44.    The video camera has no sound such that had Mr. Hunt called for medical assistance it would not have been reflected in the video monitoring. His isolation prevented other inmates from observing his condition and seeking assistance for him.

45.    At approximately 11:06 P.M., lights were turned out in the medical cells for the evening.

46.    As a result of the low light and the pixelation of the camera it became difficult to closely observe Mr. Hunt.

47.      At approximately 12:23 A.M., deputies noticed Mr. Hunt was in the same position he had been placed in when he was laid on the cot in the medical cell some one hour and 33 minutes earlier. Sergeant Holderbaum was requested to respond to the area to assist in a welfare check of Mr. Hunt.

48.      Sergeant Holderbaum arrived and he and Corporal Paxson and Deputy Mobley entered Mr. Hunt's cell.

49.      The responding deputies apparently concluded among themselves that Mr. Hunt was not breathing at that time.

50.      Despite being trained and certified in cardio pulmonary resuscitation ("CPR"), and despite a general order that requires deputies to perform CPR in medical events such as this, none of the three deputies present, made any effort whatsoever to determine whether or not Mr. Hunt had a pulse, or to commence CPR, or to intervene in any other way.  A medical emergency was called and the deputies stood about the cell essentially doing nothing until members of the medical staff arrived.

51.      At approximately 12:40 A.M. on May 19th, Lt. Campbell authorized Mr. Hunt to be released on his own recognizance, "in case he needed to be transported to a medical facility."

52.      Paramedics were called. Efforts by both jail medical staff and emergency medical personnel were unsuccessful in reviving Mr. Hunt and he was pronounced dead at approximately 1:03 A.M., May 19, 2013. An investigation was conducted by law enforcement deputies concerning the conduct of the corrections and medical staff in the events leading up to Mr. Hunt's death at the Pinellas County Jail. Such investigation included reviewing the jail surveillance videos. It was determined that no misconduct or no breach of policy, procedures, rules, or general orders occurred.

53.     On information and belief, DEFENDANT GUALTIERI viewed the Jail Surveillance Videos of Mr. Hunt's time at the Pinellas County Jail and was advised of the results of the  investigation. He voiced no objection to either the results of the investigation or what he observed.

54.     DEFENDANT GUALTIERI met with Plaintiff on or after August 19. 2013, and during such meeting DEFENDANT GUATLTIERI concealed and intentionally misrepresented the aforementioned facts surrounding Mr. Hunt's, medical condition, incarceration and medical care, specifically he stated that Mr. Hunt's medical condition was stable, not severe, that the got up, got out of the wheelchair and got up onto the bunk on his own and under his own power. None of which are true based on the Jail Surveillance Videos attached as Exhibit "D."

55.     Plaintiff did not discover nor did she have reason to discover any medical negligence on the part of any of the Defendants until a date after August 19, 2013.

**COUNT I**
**42 U.S.C. §1983 – DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED**
**UNDER THE FOURTEENTH AMENDMENT AGAINST DEFENDANT MARIA CRUZ**

56.     Plaintiff reiterates and adopts each of the allegations set forth in paragraphs 1-3, 11, 12, 13, 14, 15, 23, 24, 25, 26-29, 30, 35, 36-41, 42-49.

57.     This is an action for violation of due process rights guaranteed by the Fourteenth Amendment of the United States Constitution pursuant to 43 U.S.C. § 1983.

58.     Under the 14th Amendment of the United States Constitution, Decedent had a constitutional right to be free from punishment during the period of his detention. This right, which includes the right to receive medical attention while in custody, was clearly established at the time Decedent was initially detained and at all times he was in custody including when he was under the care of DEFENDANT CRUZ.

59.     At all times material herein, DEFENDANT CRUZ, was acting under color of state law and by virtue of the authority vested in her by the State and/or its agencies.

60.     DEFENDANT CRUZ was a member of DEFENDANT GUALTIERI'S medical staff that performed the medical intake of the Decedent at the Pinellas County Jail.

61.     At all times material herein, Decedent was objectively in serious medical need as diagnosed by a physician as mandating medical treatment *and/or* his serious medical need was so obvious that a layperson would easily recognize the necessity for a doctor's attention.

62.     DEFENDANT CRUZ had actual knowledge that Mr. Hunt suffered from a serious medical need upon his admission to the jail. DEFENDANT CRUZ observed his profound jaundice "from head to toe," yellow eyes, strawberry colored tongue, and "unsteadiness." She knew from her conversation with Mr. Hunt that he had high blood pressure, suffered from liver disease, that he had been treated by a physician for liver disease and that manifestations of his liver disease had existed for no less than a week before arriving at the Pinellas County Jail. She described him as slow in responding to her questions and "not very detailed." She further knew that Mr. Hunt's condition was such that he was required to be placed in the medical unit of the jail in isolation from other persons. Based on the foregoing information, DEFENDANT CRUZ was aware that Mr. Hunt was suffering from a serious medical condition.

63.     As a part of, or subsequent to, the intake screening DEFENDANT CRUZ called DEFENDANT QUINONES who directed that Mr. Hunt be placed in the medical unit in contact isolation. DEFENDANT QUINONES ordered Captopril 25 milligrams, lactose 15 ML two times a day, blood work and a call back in one hour (at 11:14 P.M.) to advise him of Mr. Hunt's condition at that time.

64.     Approximately 50 minutes after DEFENDANT CRUZ first encountered

Decedent she again had contact with him. By that time, his condition had further deteriorated. The decline in his condition was apparent but again DEFENDANT CRUZ took no action.

65.     Although DEFENDANT CRUZ was aware of Mr. Hunt's serious medical need, and although she was aware of his declining condition, she did nothing to address his condition. She ignored DEFENDANT QUINONES'S orders to recheck the Decedent after one hour and ignored his declining medical condition. Her actions as described above reflect a deliberate indifference to Decedent's serious medical needs.

66.     DEFENDANT CRUZ's failure to further attend to the Decedent's serious medical condition as directed by DEFENDANT QUINONES caused a delay or failure of treatment which resulted in Mr. Hunt's deterioration and eventual death.

67.     DEFENDANT CRUZ'S deliberate failure to have Decedent timely and fully medically evaluated and to again check his condition as ordered by DEFENDANT QUINONES was an act of deliberate indifference with respect to Decedent's serious medical need and posed a substantial risk of serious harm to Decedent. DEFENDANT CRUZ'S failure to act denied Decedent the right to adequate medical care and violated Decedent's 14th Amendment constitutional rights.

68.     That as a direct and proximate result of DEFENDANT CRUZ'S actions as alleged herein, GEORGE ARTHUR HUNT, IV was caused to die and KATHLEEN HUNT, as Personal Representative of the ESTATE of GEORGE ARTHUR HUNT, IV and its beneficiaries, have sustained the following past and future damages:

<u>AS TO THE ESTATE OF GEORGE ARTHUR HUNT, IV:</u>

a.     Loss of net accumulations beyond death; and

b.     Medical and funeral expenses due to the decedent's injury and death.

AS TO KATHLEEN HUNT, AS SURVIVING SPOUSE:

a.      Loss of spousal companionship and support;

b.      Mental pain and suffering; and

c.      Medical and related expenses in seeking a cure for GEORGE ARTHUR

        HUNT, IV's injuries.

AS TO EMMARY HUNT, AS SURVIVING MINOR CHILD

a.      Loss of parental companionship and support; and

b.      Mental pain and suffering.

AS TO KEATEN HUNT, AS SURVIVING MINOR CHILD

a.      Loss of parental companionship and support; and

b.      Mental pain and suffering.

WHEREFORE, Plaintiff, KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV, demands a trial by jury and a judgment against the Defendant, MARIA CRUZ, within the jurisdictional limits of this Court, to wit: more than Fifteen Thousand Dollars ($15,000.00), plus costs, attorneys' fees and interest on all liquidated damages.

## COUNT II
## 42 U.S.C. §1983 – DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED UNDER THE FOURTEENTH AMENDMENT AGAINST DEFENDANT SHAWN FOX

69.     Plaintiff reiterates and adopts each of the allegations set forth in paragraphs 1-3, 11, 12, 13, 16, 17, 21-24, 30-37, 43-52.

70.     This is an action for violation of due process rights guaranteed by the Fourteenth Amendment of the United States Constitution pursuant to 43 U.S.C. § 1983.

71.     Under the 14th Amendment of the United States Constitution, Decedent had a

right to due process and adequate medical care during the period of his detention. This right, which includes the right to receive medical attention while in custody, was clearly established at the time Decedent was initially detained and at all times he was in custody including when he was under the care of DEFENDANT FOX.

72.     At all times material herein, DEFENDANT FOX, was acting under color of state law and by virtue of the authority vested in him by the State and/or its agencies.

73.     At all times material herein, Decedent was objectively in serious medical need as diagnosed by a physician as mandating medical treatment *and/or* his serious medical need was so obvious that a layperson would easily recognize the necessity for a doctor's attention.

74.     DEFENDANT FOX, who had served as a deputy for at least seven years prior to the events at issue here, observed Mr. Hunt either upon his admission to the jail facility or shortly thereafter. (See Exhibit "D" Jail Surveillance Video, Case Folder 39, Clip_1, 7:51:40 PM - 7:58:49 PM attached hereto and incorporated by reference).

75.     DEFENDANT FOX observed his severely jaundiced condition and remarked that Mr. Hunt was the most jaundiced person he had ever seen. As DEFENDANT FOX had served in the Pinellas County Detention Facility for at least 7 years prior to the events at issue, that in that time DEFENDANT FOX had occasion to observe thousands of inmates, staff, visitors and other persons who had reason to present at the jail. However, DEFENDANT FOX stated that Mr. Hunt was the most severely jaundiced person he had ever seen.

76.     As a result DEFENDANT FOX, recognizing Mr. Hunt's serious medical condition intentionally placed Decedent ".... immediately in front of his desk in order to watch him."

77.     As Decedent was positioned immediately in front of him, DEFENDANT FOX

was able to observe the precipitous decline in Mr. Hunt's physical mobility, affect, and general physical condition.

78.     DEFENDANT FOX further observed the Decedent was in serious medical need at the time he and Corporal Paxson wheeled the Decedent to his cell in a wheelchair in the medical wing. At such time, the Decedent was extremely lethargic, nonambulatory, obtunded, barely able to move on his own and in such poor shape, that he was unable to assist in moving himself onto the bunk or assisting Corporal Paxson or DEFENDANT FOX in any way in doing so. (See Exhibit "D" Jail Surveillance Video, Case Folder 39, Clip_4, 10:45:35 PM-10:46:50 PM attached hereto and incorporated by reference).

79.     DEFENDANT FOX watched Mr. Hunt decline from an individual who was walking unaided and talking, upon his arrival at the jail to an individual who was lethargic, nonambulatory, obtunded, immobile, and uncommunicative at the time he physically placed him in a medical isolation cell.

80.     Although DEFENDANT FOX was aware that Mr. Hunt was suffering from a serious medical need and that the medical need was so obvious that a lay person would easily recognize the necessity for a doctor's attention and that his physical condition was deteriorating rapidly, he took no action to further personally interact or communicate with the Decedent or to contact any medical personnel whatsoever.

81.     DEFENDANT FOX knowingly disregarded Decedent's obviously and rapidly declining serious medical need by placing the Decedent into an isolation cell that made it more difficult to monitor his medical condition due to the fact that employees of the Sheriff's department would not be able to hear his sounds or have two communications with him and would be less of an ability or no ability to monitor his medical condition especially after the

lights were turned out at 11:06 p.m. after his entry into the medical isolation cell.

82.      It is apparent from the foregoing that DEFENDANT FOX was aware that Mr. Hunt was seriously ill, that he was rapidly becoming more unresponsive, that he had become immobile, nonambulatory, obtunded and that his declining condition posed a real risk of serious harm or death.  Notwithstanding this knowledge, DEFENDANT FOX chose to do nothing to alleviate the serious medical condition of a person in his care and custody.

83.      DEFENDANT FOX acted with deliberate indifference to Decedent's serious medical need when he chose to not recommend the immediate medical transport of the Decedent for emergency medical evaluation and instead placed him in bunk in an isolated cell in a medical unit in the jail when he knew the Decedent was in serious medical distress.

84.      DEFENDANT FOX'S deliberate failure to have Decedent timely medically evaluated or to summon any type of medical assistance were acts of deliberate indifference with respect to Decedent's serious medical condition and posed a substantial risk of serious harm to Decedent. His failure to act was also consistent with "not uncommon" policy and practice of delaying outside medical treatment of releasing medically compromised detainees and inmates to avoid the expense of medical treatments for such persons. DEFENDANT FOX'S failure to act denied Decedent the right to adequate medical and violated Decedent's 14th Amendment Constitutional Rights.

85.      DEFENDANT FOX'S violation of Decedent's constitutional rights caused Decedent's medical condition to worsen and the delay caused by DEFENDANT FOX'S constitutional actions caused Decedent to suffer constitutional injury, personal injury, and ultimately, to die.

86.      That as a direct and proximate result of  DEFENDANT FOX'S actions as alleged

herein, GEORGE ARTHUR HUNT, IV was caused to die and KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV and its beneficiaries, have sustained the following past and future damages:

### AS TO THE ESTATE OF GEORGE ARTHUR HUNT, IV:

a.     Loss of net accumulations beyond death; and

b.     Medical and funeral expenses due to the decedent's injury and death.

### AS TO KATHLEEN HUNT, AS SURVIVING SPOUSE:

a.     Loss of spousal companionship and support;

b.     Mental pain and suffering; and

c.     Medical and related expenses in seeking a cure for GEORGE ARTHUR HUNT, IV's injuries.

### AS TO EMMARY HUNT, AS SURVIVING MINOR CHILD

a.     Loss of parental companionship and support; and

b.     Mental pain and suffering.

### AS TO KEATEN HUNT, AS SURVIVING MINOR CHILD

a.     Loss of parental companionship and support; and

b.     Mental pain and suffering.

WHEREFORE, Plaintiff, KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV, demands a trial by jury and a judgment against the Defendant, SHAWN FOX, within the jurisdictional limits of this Court, to wit: more than Fifteen Thousand Dollars ($15,000.00), plus costs, attorneys' fees and interest on all liquidated damages.

## COUNT IV
## 42 U.S.C. §1983 – CUSTOM AND PRACTICE OF DELIBERATE INDIFFERENCE
## DEFENDANT GUALTIERI

87.     Plaintiff reiterates and adopts each of the allegations set forth in paragraphs 1-4, 10-19, 21-54.

88.     This is an action for violation of due process rights guaranteed by the Fourteenth Amendment of the United States Constitution pursuant to 43 U.S.C. § 1983.

89.     DEFENDANT GUALTIERI, had and has, a well settled duty to provide medical care for persons incarcerated in the Pinellas County Jail. As a former Detention Deputy, Sheriff and a member of the Florida Bar, the Defendant is well aware of that duty. DEFENDANT GUALTIERI served as Chief Deputy from mid-2006 until 2011, as General Counsel for a portion of that time and as Sheriff from November of 2011 until the present.

90.     During DEFENDANT GUALTIERI had actively engaged in reducing monies paid to healthcare providers outside the jail. Such reduction in medical payments by the Sheriff's Office to outside providers resulted in litigation by Baycare Health Systems.

91.     Although Florida law provides for sheriff's to be reimbursed for medical costs incurred on behalf of persons in custody, DEFENDANT GUALTIERI has stated publicly that "In reality, most inmates can't pay."[2]

92.     On information and belief, during the tenure of DEFENDANT GUALTIERI as chief deputy, general Counsel and Sheriff it has been the practice and unwritten policy of the Pinellas County Sheriff's Office  to reduce medical costs by rationing medical care.

93.     On information and belief, one practice to reduce medical costs which has been in place for more than six years prior to Mr. Hunts demise, is to release on recognizance persons in custody who required further potentially costly medical care and whose release did not appear to

---

[2] Pinellas County Commission Strategic Planning Session June 5, 2013.

pose a threat to public safety. It was not uncommon prior to Mr. Hunt's death to release on recognizance persons who were hospitalized with costly conditions or who were likely to cause the Sheriff to incur costs for their treatment and custody. With such persons, where possible corrections staff would effectuate the release on recognizance. In other instances prior to Mr. Hunt's death, Sheriff's personnel would approach members of the judiciary to approve the release.

94.     On information and belief, it was not uncommon prior to Mr. Hunt's death to release inmates that would likely need costly care from an outside medical provider.   As described above in paragraphs 28, 29, 34, 35, 62, 78, 79 above it was apparent to medical and corrections staff that Mr. Hunt was seriously ill.   Based on Mr. Hunt's medical history of liver disease, his profound jaundice, and his declining condition it was clear that he readily met the profile of one who was in serious medical need and would likely need further medical treatment.

95.     Based on information and belief, at some point not long after Mr. Hunt's arrival at the jail, a discussion was had as to whether he could be released within 8 hours. Although this discussion is not had with all persons charged with D.U.I. it was had with reference to Mr. Hunt because his medical condition made it obvious that he required more medical follow-up. Nurse Supervisor J. Smith was informed by Nurse Supervisor Kalicharan that because of his jaundice the intent was to release Mr. Hunt to Sunstar EMS as soon as he was in a non-custodial capacity. This was wholly consistent with the aforementioned long-standing policy of the Sheriff's Office.

96.     The above described custom and practice was not uncommon over the years its existence and happened numerous times prior to the death of Mr. Hunt. The procedure used with Mr. Hunt was neither isolated nor unique.[3]

---

[3]  Because of the privacy provisions of the Health Insurance Portability and Accountability Act, (HIPPA) Plaintiff, at this juncture is unable to provide the specific names of any other similarly situated persons.

97.     During the time prior to and including the dates of Mr. Hunt's incarceration when the aforementioned policy and practice was in place, DEFENDANT GUALTIERI served as either Chief Deputy or Sheriff of Pinellas County.  This policy was pervasive and longstanding. During this period, DEFENDANT GUALTIERI was instrumental in preparing the Sheriff's budget and was thoroughly aware of medical costs, including the amount of monies paid to outside providers and the basis for such payments. Prior to the date of Mr. Hunt's demise, DEFENDANT GUALTIERI had made substantial cuts to monies allocated to the detention and corrections bureau which included medical costs.

98.     As Sheriff and Chief Deputy, DEFENDANT GUALTIERI was directly and intimately involved in budgetary matters and in efforts to reduce expenditures in the detention and corrections bureau as well as within the Sheriff's Office as a whole.

99.     Despite the recognition of Mr. Hunt's apparent and serious medical condition and despite the obvious, dramatic, precipitous, and profound decline in Mr. Hunt's physical condition while at the jail, Mr. Hunt was provided little or no medical care. Instead, medical care was withheld and delayed because he was to be released to medical transport as a non-inmate as soon as legally possible, at some point, early on May 19, 2013.

100.    That practice, evidencing a deliberate indifference to serious medical needs, was in full force and effect at the time of Mr. Hunt's incarceration. This procedure, based on non-medical, money saving reasons, resulted in the delay or failure to provide medical treatment based on the belief the detainees/inmates would soon leave the facility and that the cost of such medical care would soon be the responsibility of some other entity.

101.    As a result of DEFENDANT GUALTIERI'S above-described policies, while being aware of Mr. Hunt's serious medical need, deputies and medical staff of the Pinellas

County Jail stood by and watched Mr. Hunt's condition decline dramatically to the point of death.

102.    DEFENDANT GUALTIERI was aware of these practices and behaviors by detention and medical staff. Further, DEFENDANT GUALTIERI ratified, endorsed and acquiesced in the constitutional violations described herein when he approved the results of the investigation finding that actions on the part of corrections staff was consistent with departmental policies and procedures to effect costs savings to the Pinellas County Sheriff's Office by rationing inmate/detainee medical care when he viewed the video of Mr. Hunt's decline and demise without taking any action to correct such policies.

103.    DEFENDANT GUALTIERI ratified, endorsed and acquiesced in these constitutional violations, specifically both the actions and the basis for these actions, the desire to save money by releasing inmates from custody prior to them incurring costly outside medical care.

104.    The wrongful policies, practices, customs and/or usages complained of herein, demonstrate a deliberate indifference on the part of DEFENDANT GUALTIERI to the constitutional rights of Mr. Hunt and were the direct and proximate cause of the violations of Plaintiff's rights alleged herein.

105.    That as a direct and proximate result of DEFENDANT GUALTIERI'S actions as alleged herein GEORGE ARTHUR HUNT, IV was caused to die and KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV and its beneficiaries, have sustained the following past and future damages:

<u>AS TO THE ESTATE OF GEORGE ARTHUR HUNT, IV:</u>

a.    Loss of net accumulations beyond death; and

b.      Medical and funeral expenses due to the decedent's injury and death.

AS TO KATHLEEN HUNT, AS SURVIVING SPOUSE:

a.      Loss of spousal companionship and support;

b.      Mental pain and suffering; and

c.      Medical and related expenses in seeking a cure for GEORGE ARTHUR

HUNT, IV's injuries.

AS TO EMMARY HUNT, AS SURVIVING MINOR CHILD

a.      Loss of parental companionship and support; and

b.      Mental pain and suffering.

AS TO KEATEN HUNT, AS SURVIVING MINOR CHILD

a.      Loss of parental companionship and support; and

b.      Mental pain and suffering.

WHEREFORE, Plaintiff, KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV, demands a trial by jury and a judgment against the Defendant, BOB GUALTIERI, in his capacity as Pinellas County Sheriff, within the jurisdictional limits of this Court, to wit: more than Fifteen Thousand Dollars ($15,000.00), plus costs, attorneys' fees and interest on all liquidated damages.

## COUNT V
## GENERAL NEGLIGENCE OF DEFENDANT GUALTIERI RESULTING IN WRONGFUL DEATH

106.    Plaintiff reiterates and adopts each of the allegations set forth in paragraphs 1-3, 9-10, 11-17, 21-52.

107.    That at all times material herein, the DEFENDANT GUALTIERI, in his capacity as Pinellas County Sheriff is vicariously liable for the negligent acts of his staff, agents and/or

employees alleged herein, including but not limited to DEFENDANT FOX, Corporal Fox, Deputy Mobley, Deputy Alderman and Sergeant Holderbaum.

108.    That the staff and/or employees of DEFENDANT GUALTIERI knew or should have known of Mr. Hunt's serious medical condition during the initial intake interview.

109.    That the staff and/or employees of DEFENDANT GUALTIERI including but not limited to DEFENDANT FOX, Corporal Paxson, Deputy Mobley, and Sergeant Holderbaum had knowledge of the serious medical need of Mr. Hunt in that they saw his jaundiced condition and heard that he had a history of liver problems.

110.    As a result of such knowledge, staff and/or employees of DEFENDANT GUALTIERI, believed to be primarily Sergeant Holderbaum, made the decision to fast track the ROR processing of Mr. Hunt so that he could be released to Sunstar EMS for transport to an emergency room.

111.    That the staff and/or employees of DEFENDANT GUALTIERI including but not limited to DEFENDANT FOX, Corporal Paxson, Deputy Mobley, Deputy Alderman and Sergeant Holderbaum had knowledge that Mr. Hunt's condition deteriorated from the time he was initially arrested to the time he was placed in a medical isolation cell.

112.    Furthermore, DEFENDANT FOX and Corporal Paxson specifically saw Mr. Hunt after he had even deteriorated significantly to the point he was not ambulatory, unable to move on his own, in a wheelchair and unable to assist in any way in the transfer of himself into a bunk. (See Exhibit "D" Jail Surveillance Video, Case Folder 39, Clip_4, 10:45:35 PM-10:46:50 PM attached hereto and incorporated by reference).

113.    That the staff and/or employees of DEFENDANT GUALTIERI, including but not limited to DEFENDANT FOX, Corporal Paxson, Deputy Mobley, Deputy Alderman and

Sergeant Holderbaum, had a duty to use due care in the processing and detention of the inmates at the Pinellas County Jail including the Decedent.

      114.    That DEFENDANT GUALTIERI, breached this duty and was otherwise negligent in the following particulars:

      a.    By non medical staff failing to use reasonable care in the intake screening of Decedent;

      b.    By non medical staff failing to use reasonable care in the evaluation of the Decedent's medical condition;

      c.    By non medical staff failing to use reasonable care in evaluating whether the Decedent should be transported to an emergency medical facility for crucial emergency medical evaluation and treatment;

      d.    By non medical staff failing to reasonably transport the Decedent to an emergency medical facility for crucial emergency medical evaluation and treatment;

      e.    By non medical staff abandoning the Decedent in a medical cell when he was clearly in medical distress and in need of emergency medical evaluation and treatment;

      f.    By non medical staff not summoning medical staff for further medical evaluation of the Decedent in his medical cell when he was clearly in medical distress and in need of emergency medical evaluation and treatment;

      g.    By non medical staff not effectively conducting the required 15 minute welfare checks while he was in the isolation cell;

      h.    By non medical staff permitting and requiring officers to conduct inmate

welfare checks in isolation cells using camera equipment that in low light conditions make it defect or impossible to detect if an inmate is breathing and deprive the evaluator of the ability to hear the inmate and conduct two way communication; and

i.    By non medical staff failing to use reasonable care in evaluating the physician's providing medical care at the Pinellas County Jail including verifying that they are in fact have a valid medical license.

115.    That as a direct and proximate result of DEFENDANT GUALTIERI'S, actions as alleged herein, GEORGE ARTHUR HUNT, IV was caused to die and KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV and its beneficiaries, have sustained the following past and future damages:

AS TO THE ESTATE OF GEORGE ARTHUR HUNT, IV:

a.    Loss of net accumulations beyond death; and

b.    Medical and funeral expenses due to the decedent's injury and death.

AS TO KATHLEEN HUNT, AS SURVIVING SPOUSE:

a.    Loss of spousal companionship and support;

b.    Mental pain and suffering; and

a.    Medical and related expenses in seeking a cure for GEORGE ARTHUR HUNT, IV's injuries.

AS TO EMMARY HUNT, AS SURVIVING MINOR CHILD

a.    Loss of parental companionship and support; and

b.    Mental pain and suffering.

AS TO KEATEN HUNT, AS SURVIVING MINOR CHILD

a.    Loss of parental companionship and support; and

b.      Mental pain and suffering.

WHEREFORE, Plaintiff, KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV, demands a trial by jury and a judgment against the Defendant BOB GUALTIERI, in his capacity as Pinellas County Sheriff, within the jurisdictional limits of this Court, to wit: more than Fifteen Thousand Dollars ($15,000.00), plus costs, attorneys' fees and interest on all liquidated damages.

**COUNT VI**
**MEDICAL NEGLIGENCE OF DEFENDANT GUALTIERI RESULTING IN WRONGFUL DEATH**

116.    Plaintiff reiterates and adopts each of the allegations set forth in paragraphs 1-10, 11-19, 21-52, 55.

117.    That at all times material herein, the DEFENDANT GUALTIERI, in his capacity as Pinellas County Sheriff is vicariously liable for the negligent acts of his staff, agents and/or employees alleged herein, including but not limited to DEFENDANT CRUZ; and Nurse Kalicharan.

118.    That the staff and/or employees of DEFENDANT GUALTIERI including but not limited to Nurse Harrell, DEFENDANT CRUZ; and Nurse Kalicharan had knowledge of the serious medical condition of Mr. Hunt in that they saw his jaundiced condition and heard that he had a history of liver problems.

119.    That the staff and/or employees of DEFENDANT GUALTIERI knew or should have known of Mr. Hunt's serious medical condition during the initial intake interview and medical questioning by Nurse Tricia Harrell.

120.    At this stage of the intake process Nurse Harrell in fact was told that Mr. Hunt had been diagnosed with liver problems, and saw that Mr. Hunt was jaundiced color, and had jaundiced

eyes.

121.    DEFENDANT CRUZ began the medical screening of Mr. Hunt at approximately 9:41 PM at such time she had the information gathered and observed by Nurse Harrell and herself observed his head to toe jaundice for 1 week, that he had a blood pressure of 151/68, the fact that he was a poor historian, that he was slow in responding to questions and the fact that he had an unsteady gait for which she gave him a wheelchair that he had not previously required as he had walked into the jail.

122.    Due to Mr. Hunt's condition, DEFENDANT CRUZ consulted with her supervisor Nurse Kalicharan, who in turn consulted with Sergeant Holderbaum about Mr. Hunt's medical condition, which ultimately led to the decision to fast track Mr. Hunt's release so that he could be released to Sunstar EMS for transport to an emergency room. In fact, prior to him being placed in isolation DEFENDANT GUALTIERI through his employees and/or staff has already planned for him to be transported by Sunstar EMS to an emergency room when he released on his own recognizance.

123.    Notwithstanding the knowledge of the staff and/or employees of DEFENDANT GUALTIERI including but not limited to Nurse Harrell, DEFENDANT CRUZ; and Nurse Kalicharan of Mr. Hunt's serious medical condition as alleged above, Mr. Hunt was not immediately transported to an emergency room.

124.    As a result of such knowledge above, staff and/or employees of DEFENDANT GUALTIERI, believed to be primarily Sergeant Holderbaum, made the decision to fast track the ROR processing of Mr. Hunt so that he could be released to Sunstar EMS for transport to an emergency room. That the medical staff and/or employees of DEFENDANT GUALTIERI, in his capacity as Pinellas County Sheriff, negligently breached the prevailing professional standard of

care for similar health care providers, in their care and treatment of the Decedent, in the following particulars:

a. By failing to insure that its physicians, including Dr. Quinones, providing medical care in the Pinellas County Jail were licensed by the Florida Department of Professional Regulation;

b. By ignoring Mr. Hunt's rapidly deteriorating medical condition including but not limited to his significant reduction in ambulation and lethargy;

c. By failing to timely re-evaluate Mr. Hunt's medical condition and provide medical intervention in a timely manner;

d. By failing to call the on call physician again for further guidance, re-evaluation and/or instruction;

e. By failing to transport Mr. Hunt to an emergency room;

f. By failing to provide reasonable and necessary first response care to Mr. Hunt including basic cardio-pulmonary resuscitation in a timely and appropriate manner;

g. By failing to provide reasonable medical care to jaundiced patient who was rapidly deteriorating including timely transport to an appropriately emergency medical facility.

125. That the aforesaid conduct of the staff, agents and/or employees of DEFENDANT GUALTIERI, in his capacity as Pinellas County Sheriff, in their care and treatment of GEORGE ARTHUR HUNT, IV, as alleged above, represents a breach of the accepted standard of care for similar health care providers in either Pinellas County, Florida or any other similar medical community.

126.    That as a direct and proximate result of the negligence of DEFENDANT GUALTIERI and/or his employees GEORGE ARTHUR HUNT, IV was caused to die and KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV and its beneficiaries, have sustained the following past and future damages:

AS TO THE ESTATE OF GEORGE ARTHUR HUNT, IV:

a.      Loss of net accumulations beyond death; and

b.      Medical and funeral expenses due to the decedent's injury and death.

AS TO KATHLEEN HUNT, AS SURVIVING SPOUSE:

a.      Loss of spousal companionship and support;

b.      Mental pain and suffering; and

c.      Medical and related expenses in seeking a cure for GEORGE ARTHUR HUNT, IV's injuries.

AS TO EMMARY HUNT, AS SURVIVING MINOR CHILD

a.      Loss of parental companionship and support; and

b.      Mental pain and suffering.

AS TO KEATEN HUNT, AS SURVIVING MINOR CHILD

a.      Loss of parental companionship and support; and

b.      Mental pain and suffering.

WHEREFORE, Plaintiff, KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV, demands a trial by jury and a judgment against the Defendant, BOB GUALTIERI, in his capacity as Pinellas County Sheriff, within the jurisdictional limits of this Court, to wit: more than Fifteen Thousand Dollars ($15,000.00), plus costs, attorneys' fees and interest on all liquidated damages.

## COUNT VII
## BREACH OF CONTRACT BY DEFENDANT MAXIM

127.    Plaintiff reiterates and adopts each of the allegations set forth in paragraphs 1-3, 9, 11-13, 15-19, 21-49, 51-52.

128.    The DEFENDANT GUALTIERI had in place a contract with DEFENDANT MAXIM which among other things provided for DEFENDANT MAXIM to provide fully licensed and skilled on-call physicians to provide medical care to the inmates at the Pinellas County Jail, including the Decedent.

129.    The contract was originally entered into between DEFENDANT MAXIM and the previous Pinellas County Sheriff, Jim Coats on October 5, 2010 and is attached hereto and incorporated by reference as Exhibit "E."

130.    The contract was amended by way of an Agreement Amendment signed by the DEFENDANT GUALTIERI on May 23, 2013 and is attached hereto and incorporated by reference as Exhibit "F."

131.    As an inmate at the Pinellas County Jail who received medical care, the Decedent was intended both by DEFENDANT GUALTIERI and DEFENDANT MAXIM to be a primary and direct beneficiary of the contract

132.    The Plaintiff asked the DEFENDANT MAXIM if they provided medical care to the Decedent and DEFENDANT MAXIM responded that it did not provide medical care to the Decedent.

133.    The DEFENDANT MAXIM, breached this contract by providing the Pinellas County Jail with physicians who were not fully licensed under the laws of the State of Florida or in the alternative not practicing medicine within the scope of their license(s) including DEFENDANT QUINONES. More specifically, on information and belief, DEFENDANT

QUINONES was only licensed to practice in an area of critical need for the Florida Department of Corrections under the supervision of its physicians and was never licensed to practice for DEFENDANT MAXIM, DEFENDANT GUALTIERI or at the Pinellas County Jail.

134.    That as a direct and proximate result of DEFENDANT MAXIM'S breach of contract as alleged herein GEORGE ARTHUR HUNT, IV was caused to die and KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV and its beneficiaries, have sustained the following past and future damages:

AS TO THE ESTATE OF GEORGE ARTHUR HUNT, IV:

a.      Loss of net accumulations beyond death; and

b.      Medical and funeral expenses due to the decedent's injury and death.

AS TO KATHLEEN HUNT, AS SURVIVING SPOUSE:

a.      Loss of spousal companionship and support;

b.      Mental pain and suffering; and

c.      Medical and related expenses in seeking a cure for GEORGE ARTHUR HUNT, IV's injuries.

AS TO EMMARY HUNT, AS SURVIVING MINOR CHILD

a.      Loss of parental companionship and support; and

b.      Mental pain and suffering.

AS TO KEATEN HUNT, AS SURVIVING MINOR CHILD

a.      Loss of parental companionship and support; and

b.      Mental pain and suffering.

WHEREFORE, Plaintiff, KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV, demands a trial by jury and a judgment against the

Defendant, MAXIM PHYSICIAN RESOURCES, LLC, within the jurisdictional limits of this Court, to wit: more than Fifteen Thousand Dollars ($15,000.00), plus costs, attorneys' fees and interest on all liquidated damages.

**COUNT VIII**
**NEGLIGENCE OF DEFENDANT MAXIM RESULTING IN WRONGFUL DEATH**

135.    Plaintiff reiterates and adopts each of the allegations set forth in paragraphs 1-15, 18-19, 21-52, 55.

136.    That DEFENDANT MAXIM, had a duty to use due care in its business practices including but not limited to the hiring and retention of its physicians.

137.    The Plaintiff asked DEFENDANT MAXIM if they provided medical care to the Decedent and DEFENDANT MAXIM responded that it did not provide medical care to the Decedent.

138.    That DEFENDANT MAXIM, breached this duty and was otherwise negligent in the following particulars:

        a.    By negligently hiring its employees and/or agents including its physicians including DEFENDANT QUINONES;

        b.    By negligently failing to verify that its physicians, including DEFENDANT QUINONES, were fully licensed and acting within the scope of such license when providing services to the Pinellas County Jail;

        c.    By negligently retaining its employees and/or agents including its physicians, including DEFENDANT QUINONES;

        d.    By negligently supervising and/or monitoring its employees and/or agents including its physicians, including DEFENDANT QUINONES; and

        e.    By negligently training its employees and/or agents including its

physicians, including DEFENDANT QUINONES.

139.    That as a direct and proximate result of DEFENDANT MAXIM'S negligence as alleged herein, GEORGE ARTHUR HUNT, IV was caused to die and KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV and its beneficiaries, have sustained the following past and future damages:

AS TO THE ESTATE OF GEORGE ARTHUR HUNT, IV:

    a.       Loss of net accumulations beyond death; and

    b.       Medical and funeral expenses due to the decedent's injury and death.

AS TO KATHLEEN HUNT, AS SURVIVING SPOUSE:

    a.       Loss of spousal companionship and support;

    b.       Mental pain and suffering; and

    c.       Medical and related expenses in seeking a cure for GEORGE ARTHUR HUNT, IV's injuries.

AS TO EMMARY HUNT, AS SURVIVING MINOR CHILD

    a.       Loss of parental companionship and support; and

    b.       Mental pain and suffering.

AS TO KEATEN HUNT, AS SURVIVING MINOR CHILD

    a.       Loss of parental companionship and support; and

    b.       Mental pain and suffering.

WHEREFORE, Plaintiff, KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV, demands a trial by jury and a judgment against the Defendant MAXIM PHYSICIAN RESOURCES, LLC within the jurisdictional limits of this Court, to wit: more than Fifteen Thousand Dollars ($15,000.00), plus costs, attorneys' fees and

interest on all liquidated damages.

**COUNT IX**
**MEDICAL NEGLIGENCE OF DEFENDANT MAXIM RESULTING IN WRONGFUL DEATH**

140.   Plaintiff reiterates and adopts each of the allegations set forth in paragraphs 1-13, 15-19, 21-55.

141.   That at all times material herein, the DEFENDANT MAXIM is vicariously liable for the negligent acts of its staff, agents and/or employees alleged herein, including but not limited to DEFENDANT QUINONES.

142.   That at all times material herein DEFENDANT QUINONES had a physician-patient relationship with Mr. Hunt.

143.   On the night in question, May 18, 2013, DEFENDANT QUINONES was contacted by telephone by DEFENDANT CRUZ concerning Mr. Hunt.

144.   DEFENDANT QUINONES was not on site but was at a remote location.

145.   Although DEFENDANT QUINONES had only a limited license to practice medicine and although he was apparently practicing outside the scope of such license in this instance, he was contracted to provide coverage for inmates during the hours that staff physicians were not on the jail premises.  More specifically, on information and belief, DEFENDANT QUINONES was only licensed to practice in an area of critical need for the Florida Department of Corrections under the supervision of its physicians and was never licensed to practice for DEFENDANT MAXIM, DEFENDANT GUALTIERI or at the Pinellas County Jail.

146.   During DEFENDANT QUINONES'S telephone call with DEFENDANT CRUZ, DEFENDANT QUINONES was told of Mr. Hunt's being jaundiced for 1 week head to toe, his unsteady gait, that he was a poor historian, that he was slow in answering questions, and he had a

blood pressure of 151/68.

147.   DEFENDANT QUINONES ordered labs, Captopril 25 mg an lactose, that Mr. Hunt be placed in contact isolation and that Mr. Hunt's blood pressure be rechecked in 1 hour but he did not inquire whether Mr. Hunt's condition had declined since he had arrived at the jail.

148.   That the staff, agents and/or employees of MAXIM, including but not limited to DEFENDANT QUINONES, negligently breached the prevailing professional standard of care for similar health care providers, in their care and treatment of the Decedent, in the following particulars:

a.   By not verifying that DEFENDANT QUINONES was properly licensed to practice medicine at the Pinellas County Jail;

b.   By Dr. Quinones, or any other employees of Maxim Physician Resources, LLC, not providing adequate medical evaluation and care to Mr. Hunt;

c.   By Dr. Quinones, or any other employees of Maxim Physician Resources, LLC, not ordering that Mr. Hunt be seen and evaluated in person by a physician;

d.   By Dr. Quinones, or any other employees of Maxim Physician Resources, LLC, not ordering that Mr. Hunt be treated much more aggressively and in a secondary or tertiary medical facility; and

e.   It is clear from all of the evidence presented that Mr. Hunt's care fell below the standard of care and tripped the threshold of deliberate indifference.

149.   That the aforesaid conduct of the staff, agents and/or employees of DEFENDANT MAXIM, in their care and treatment of GEORGE ARTHUR HUNT, IV, as alleged above,

represents a breach of the accepted standard of care for similar health care providers in either Pinellas County, Florida or any other similar medical community.

150.    That as a direct and proximate result of DEFENDANT MAXIM'S negligence as alleged herein, GEORGE ARTHUR HUNT, IV was caused to die and KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV and its beneficiaries, have sustained the following past and future damages:

AS TO THE ESTATE OF GEORGE ARTHUR HUNT, IV:

a.      Loss of net accumulations beyond death; and

b.      Medical and funeral expenses due to the decedent's injury and death.

AS TO KATHLEEN HUNT, AS SURVIVING SPOUSE:

a.      Loss of spousal companionship and support;

b.      Mental pain and suffering; and

c.      Medical and related expenses in seeking a cure for GEORGE ARTHUR HUNT, IV's injuries.

AS TO EMMARY HUNT, AS SURVIVING MINOR CHILD

a.      Loss of parental companionship and support; and

b.      Mental pain and suffering.

AS TO KEATEN HUNT, AS SURVIVING MINOR CHILD

a.      Loss of parental companionship and support; and

b.       Mental pain and suffering.

WHEREFORE, Plaintiff, KATHLEEN HUNT, as Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV, demands a trial by jury and a judgment against the Defendant MAXIM PHYSICIAN RESOURCES, LLC within the jurisdictional limits of this

Court, to wit: more than Fifteen Thousand Dollars ($15,000.00), plus costs, attorneys' fees and interest on all liquidated damages.

## COUNT X
## MEDICAL NEGLIGENCE OF DEFENDANT QUINONES RESULTING IN WRONGFUL DEATH

151.   Plaintiff reiterates and adopts each of the allegations set forth in paragraphs 1-3, 5-13, 18-19, 21-33, 38-49, 52, 55.

152.   That at all times material herein DEFENDANT QUINONES had a physician-patient relationship with Mr. Hunt.

153.   On the night in question, May 18, 2013, DEFENDANT QUINONES was contacted by telephone by DEFENDANT CRUZ concerning Mr. Hunt.

154.   DEFENDANT QUINONES was not on site but was at a remote location.

155.   Although DEFENDANT QUINONES had only a limited license to practice medicine and although he was apparently practicing outside the scope of such license in this instance, he was contracted to provide coverage for inmates during the hours that staff physicians were not on the jail premises. More specifically, on information and belief, DEFENDANT QUINONES was only licensed to practice in an area of critical need for the Florida Department of Corrections under the supervision of its physicians and was never licensed to practice for DEFENDANT MAXIM, DEFENDANT GUALTIERI or at the Pinellas County Jail.

156.   During DEFENDANT QUINONES'S telephone call with DEFENDANT CRUZ, DEFENDANT QUINONES was told of Mr. Hunt's being jaundiced for 1 week head to toe, his unsteady gait, that he was a poor historian, that he was slow in answering questions, and he had a blood pressure of 151/68.

157.   DEFENDANT QUINONES ordered labs, Captopril 25 mg, lactose, that Mr. Hunt

be placed in contact isolation and that Mr. Hunt's blood pressure be rechecked in 1 hour, but he did not inquire whether Mr. Hunt's condition had declined since he had arrived at the jail.

158.   That DEFENDANT QUINONES, negligently breached the prevailing professional standard of care for similar health care providers, in their care and treatment of the Decedent, in the following particulars:

    a.   By practicing at the Pinellas County Jail outside the scope of his license;

    b.   By Dr. Quinones, or any other employees of Maxim Physician Resources, LLC, not providing adequate medical evaluation and care to Mr. Hunt;

    c.   By Dr. Quinones, or any other employees of Maxim Physician Resources, LLC, not ordering that Mr. Hunt be seen and evaluated in person by a physician;

    d.   By Dr. Quinones, or any other employees of Maxim Physician Resources, LLC, not ordering that Mr. Hunt be treated much more aggressively and in a secondary or tertiary medical facility; and

    e.   It is clear from all of the evidence presented that Mr. Hunt's care fell below the standard of care and tripped the threshold of deliberate indifference.

159.   That the aforesaid conduct of DEFENDANT QUINONES in his care and treatment of GEORGE ARTHUR HUNT, IV, as alleged above, represents a breach of the accepted standard of care for similar health care providers in either Pinellas County, Florida or any other similar medical community.

160.   That as a direct and proximate result of DEFENDANT QUINONES'S negligence as alleged herein, GEORGE ARTHUR HUNT, IV was caused to die and KATHLEEN HUNT, as

Personal Representative of the ESTATE OF GEORGE ARTHUR HUNT, IV and its beneficiaries, have sustained the following past and future damages:

### AS TO THE ESTATE OF GEORGE ARTHUR HUNT, IV:

a.      Loss of net accumulations beyond death; and

b.      Medical and funeral expenses due to the decedent's injury and death.

### AS TO KATHLEEN HUNT, AS SURVIVING SPOUSE:

a.      Loss of spousal companionship and support;

b.      Mental pain and suffering; and

c.      Medical and related expenses in seeking a cure for GEORGE ARTHUR HUNT, IV's injuries.

### AS TO EMMARY HUNT, AS SURVIVING MINOR CHILD

a.      Loss of parental companionship and support; and

b.      Mental pain and suffering.

### AS TO KEATEN HUNT, AS SURVIVING MINOR CHILD

a.      Loss of parental companionship and support; and

b.      Mental pain and suffering.

WHEREFORE, Plaintiff,  of the ESTATE OF GEORGE ARTHUR HUNT, IV, demands a trial by jury and a judgment against the Defendant LUIS A. QUINONES, M.D. within the jurisdictional limits of this Court, to wit: more than Fifteen Thousand Dollars ($15,000.00), plus costs, attorneys' fees and interest on all liquidated damages.

Dated this 19th day of October, 2015.

/s/ Joshua T. Chilson
**Joshua T. Chilson**
Fla. Bar No.: 027592
Primary: jchilson@ksbclaw.com
Secondary: skroto@ksbclaw.com
**Kwall, Showers, Barack & Chilson, P.A.**
133 North Fort Harrison Avenue
Clearwater, Florida 33755
(727) 441-4947 FAX (727) 447-3158
Counsel for Plaintiff

And

/s/ Bryan D. Caufield
**Bryan D. Caulfield**
Fla. Bar No.: 767530
Primary:  bryan@uslaw.com
Secondary:  tina@usalaw.com
**Perenich, Caufield, Avril, & Noyes, P.A.**
1875 North Belcher Road, Suite 201
Clearwater, FL  33765
(727) 796-8282 FAX (727) 797-3667
Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished via the Court's

ECF system on October 19, 2015 to:

Nicole E. Durkin
10750 Ulmerton Road
Largo, FL 33778
NDurkin@pcsonet.com
Amarcottl@pcsonet.com
Attorney for Bob Gualtieri, Maria Cruz, Shawn Fox and Gary Paxson

and

Donna J. Fudge
Fudge & McArthur, P.A.
650 16th St. N.
St. Petersburg, FL 33705
dfudge@fudgemcarthur.com
lhicks@fudgemcarthur.com
prozelle@fudgemcarthur.com
Attorney for Bob Gualtieri, Maria Cruz, Shawn Fox, and Gary Paxson

and

Janice L. Merrill
Marshall, Dennehey, Warner,
Coleman & Goggin, P.A.
315 E. Robinson Street, Suite 550
Orlando, FL 32801-2719
jlmerrill@mdwcg.com
Attorney for Maxim Physician Resources, LLC

/s/ Joshua T. Chilson
Attorney

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

KATHLEEN HUNT, as Personal Representative
of the ESTATE OF GEORGE ARTHUR HUNT, IV,
         Plaintiff,

                                      Case   No: 8:15-cv-1257-T-33EAJ
vs.

BOB GUALTIERI, in his capacity as Pinellas
County Sheriff; MARIA CRUZ, SHAWN FOX;
GARY PAXSON; AND MAXIM PHYSICIAN
RESOURCES, LLC,
         Defendants.
_____/

# EXHIBIT A
# TO PLAINTIFF'S AMENDED
# COMPLAINT

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL
CIRCUIT IN AND FOR PINELLAS COUNTY, FLORIDA

KATHLEEN KENNEDY HUNT,
as Personal Representative of the Estate of
GEORGE ARTHUR HUNT, IV, Deceased,

      Petitioner,

vs.                          Case No.

BOB GUALTIERI, as SHERIFF OF PINELLAS
COUNTY SHERIFF'S OFFICE,
PINELLAS COUNTY SHERIFF'S OFFICE,
PINELLAS COUNTY JAIL-INMATE HEALTH CARE DIVISION,
MAXIM PHYSICIAN RESOURCES, LLC, LUIS A.
QUINONES, MARIA CRUZ, CRISTINA KALICHARAN,
JO SMITH, and TRICIA HARRELL,

      Defendants.

_____/

## PETITION FOR AUTOMATIC 90 DAY EXTENSION

    Petitioner,  KATHLEEN KENNEDY HUNT, as personal representative of the ESTATE

OF GEORGE ARTHUR HUNT, IV, by and through the undersigned attorneys, file this Petition

to the Clerk of the Court for an automatic 90 day extension of the Statute of Limitations,

pursuant to Florida Statute §766.104(2).

    Dated this 5⁵ day of August, 2014.

                       Joshua T. Chilson
                       Kwall, Showers & Barack, P.A.
                       133 North Fort Harrison Avenue
                       Clearwater, Florida 33755
                       (727) 441-4947 FAX (727) 447-3158
                       Fla. Bar No.: 027592
                       Primary:    jchilson@ksblaw.com
                       Secondary:   dsnyder@ksblaw.com
                       Counsel for Plaintiff

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

KATHLEEN HUNT, as Personal Representative
of the ESTATE OF GEORGE ARTHUR HUNT, IV,
       Plaintiff,

                                  Case   No: 8:15-cv-1257-T-33EAJ
vs.

BOB GUALTIERI, in his capacity as Pinellas
County Sheriff; MARIA CRUZ, SHAWN FOX;
GARY PAXSON; AND MAXIM PHYSICIAN
RESOURCES, LLC,
       Defendants.
_____/

# EXHIBIT B
# TO PLAINTIFF'S AMENDED
# COMPLAINT

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

KATHLEEN HUNT, as Personal Representative
of the ESTATE OF GEORGE ARTHUR HUNT, IV,
           Plaintiff,

                                    Case   No: 8:15-cv-1257-T-33EAJ

vs.

BOB GUALTIERI, in his capacity as Pinellas
County Sheriff; MARIA CRUZ, SHAWN FOX;
GARY PAXSON; AND MAXIM PHYSICIAN
RESOURCES, LLC,
           Defendants.
_____/

## <u>CERTIFICATE OF GOOD FAITH</u>

The undersigned attorney certifies that he has made a reasonable investigation as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the medical care and medical treatment of GEORGE ARTHUR HUNT, IV by the Defendant, BOB GUALTIERI, in his capacity as Pinellas County Sheriff; by his employees and/or agents including but not limited to by Defendant, MARIA CRUZ, R.N. and Nurse Christina Kalicharan, R.N.; and by Defendant MAXIM PHYSICIAN RESOURCES, LLC and its employees and/or agents, and by Defendant, LUIS QUINONES, MD.

                       /s/ Joshua T. Chilson
                       **Joshua T. Chilson**
                       Fla. Bar No.: 027592
                       Primary:     jchilson@ksbclaw.com
                       Secondary:   skroto@ksbclaw.com
                       **Kwall, Showers, Barack & Chilson, P.A.**
                       133 North Fort Harrison Avenue
                       Clearwater, Florida 33755
                       (727) 441-4947 FAX (727) 447-3158
                       Counsel for Plaintiff

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

KATHLEEN HUNT, as Personal Representative
of the ESTATE OF GEORGE ARTHUR HUNT, IV,
             Plaintiff,

                                                    Case   No: 8:15-cv-1257-T-33EAJ

vs.

BOB GUALTIERI, in his capacity as Pinellas
County Sheriff; MARIA CRUZ, SHAWN FOX;
GARY PAXSON; AND MAXIM PHYSICIAN
RESOURCES, LLC,
             Defendants.
_____/

# EXHIBIT C
# TO PLAINTIFF'S AMENDED
# COMPLAINT

Electronically Filed 07/02/2013 09:37:08 AM ET

**FILED 7/8/2013 2:37:44 PM KEN BURKE, Clerk of the Circuit Court and Comptroller, Pinellas County**

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA

IN RE: THE ESTATE OF

CASE NO. _____

GEORGE ARTHUR HUNT, IV

Ref. number: 13004508ES

    Deceased.

_____/

## ORDER APPOINTING PERSONAL REPRESENTATIVE

On the Petition of Kathleen Kennedy Hunt for administration of the estate of GEORGE ARTHUR HUNT, IV, deceased, the Court finding that the decedent died on May 19, 2013, and that Kathleen Kennedy Hunt is entitled to preference pursuant to Florida Statute §733.301, it is

ADJUDGED that Kathleen Kennedy Hunt, is appointed Personal Representative of the estate of the decedent and that upon taking the prescribed oath, filing the designation of resident agent and acceptance, and ( ) entering into a bond in the sum of $18,000.00, Letters of Administration shall be issued.

ORDERED this ____ day of _____ 2013.

                           Jack R. St. Arnold, Circuit Judge

**July 8, 2013**

CIRCUIT JUDGE

Copies to:
James E. Royal, Esquire

P:\WPDOCS\Hunt George\Hunt - Order Appt PR.wpd\June 28, 2013bsm

TRUE COPY

***ELECTRONICALLY FILED 7/2/2013 9:37:05 AM: KEN BURKE, CLERK OF THE CIRCUIT COURT, PINELLAS COUNTY***

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

KATHLEEN HUNT, as Personal Representative
of the ESTATE OF GEORGE ARTHUR HUNT, IV,
       Plaintiff,

                                         Case   No: 8:15-cv-1257-T-33EAJ
vs.

BOB GUALTIERI, in his capacity as Pinellas
County Sheriff; MARIA CRUZ, SHAWN FOX;
GARY PAXSON; AND MAXIM PHYSICIAN
RESOURCES, LLC,
       Defendants.
_____/

# EXHIBIT D
# TO PLAINTIFF'S AMENDED COMPLAINT –
# DVD

# (to be filed under separate cover in a Notice of Filing, pursuant to the Court's Order of October 16, 2015)

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

KATHLEEN HUNT, as Personal Representative
of the ESTATE OF GEORGE ARTHUR HUNT, IV,
                    Plaintiff,

                                        Case   No: 8:15-cv-1257-T-33EAJ

vs.

BOB GUALTIERI, in his capacity as Pinellas
County Sheriff; MARIA CRUZ, SHAWN FOX;
GARY PAXSON; AND MAXIM PHYSICIAN
RESOURCES, LLC,
                    Defendants.
_____/

# EXHIBIT E
# TO PLAINTIFF'S AMENDED COMPLAINT



PHYSICIAN RESOURCES™

*SERVICE AGREEMENT FOR LOCUM TENENS COVERAGE*

This agreement is made this 26th day of August 2010 ("Effective Date") by and between **Maxim Physician Resources, LLC**, with an office located at 5001 LBJ Freeway, Suite 900, Dallas TX 75244, (hereinafter "MPR") and **JIM COATS**, in his capacity as Sheriff of Pinellas County, Florida with an office located at 14400 49th Street N., Clearwater, FL 33762 (hereinafter referred to as "Pinellas County Sheriff's Office" or "PCSO").

### RECITALS

WHEREAS, PCSO agrees to pay the Rates set forth in the Assignment Confirmation for services rendered by Providers placed through MPR.  Unless otherwise specified in this Agreement, MPR will be solely responsible to compensate the Provider(s) for services under this Agreement.  This Agreement will be for Provider specialties listed in the Assignment Confirmation, plus any additional specialties that MPR may have occasion to quote to PCSO. Pricing for additional specialties will be provided in writing upon request of PCSO.

### ARTICLE 1. TERM OF AGREEMENT

Section 1.1    **Term.**  The Agreement shall commence on the day first listed above and shall continue for twelve (12) months unless terminated earlier as provided herein. At the end of this initial term, the Agreement shall automatically be extended for additional one (1) year terms unless written notice is provided by either party regarding the non-renewal of this Agreement within (30) days prior to the end of the initial term or any subsequent renewal.

### ARTICLE 2. RESPONSIBILITIES OF MAXIM

Section 2.1    **Personnel.**  To assist PCSO in obtaining high quality Provider services, MPR will:

- use best efforts to provide Provider(s) acceptable to PCSO;

- provide compensation for the Provider(s) directly;

- arrange for local transportation, reasonable living accommodations outside of the hospital or clinic, and round-trip transportation for Provider to PCSO's community;

- provide any assigned Provider with Professional Liability insurance with minimum amounts of one million dollars ($1,000,000) per occurrence and three million ($3,000,000) annual aggregate. Proof of such insurance shall be provided to PCSO upon request.

- make a good faith effort to verify and assist Provider in obtaining licensure, as necessary (it is ultimately the Provider's responsibility to make sure their license is current, active and in good standing for any MPR assignment). And notwithstanding the above, in no way shall any payment or monies owed to MPR be held due to the credentialing process of any Provider and

- permit PCSO to retain income generated by locum tenens Provider(s).

- provide for costs of local transportation for Provider, reasonable living accommodations outside of the hospital or facility, and round trip transportation for Provider to and from PCSO'S community prior to the assignment and at the termination of the assignment;

### ARTICLE 3. RESPONSIBILITIES OF PCSO

Section 3.1    **Responsibilities.**  To enable MPR to attract qualified Providers to PCSO facility, PCSO will:

- notify MPR of the acceptability of any Provider presented to PCSO within two (2) working days unless otherwise mutually agreed upon;

Page 1 of 5                    Copyright 2005-2009
All Rights Reserved

- provide the Locum Tenens Provider(s), according to the required specialty, with a reasonable work schedule, reasonably maintained and usual and customary equipment and supplies, a suitable practice environment complying with the acceptable ethical and procedural standards, and, as necessary, appropriately trained support staff to enable the Provider(s) to perform medical services;

- comply with AMA, JCAHO, federal, state and local standards relating to patient care and related activities;

- comply with OSHA regulations;

### ARTICLE 4. ASSIGNMENT CONFIRMATION

Section 4.1    **Confirmations.** Each individual Provider assignment will be confirmed in writing with the specific hourly rates to be charged for a specific Provider to work a specific assignment. Assignment Confirmations will be sent via electronic mail, facsimile, or reliable carrier as agreed upon by PCSO and MPR. In the event that PCSO fails to respond to the Assignment Confirmation within two (2) business days, the PCSO will be deemed to have accepted the terms in said Assignment Confirmation and PCSO will assume responsibility for any applicable payment terms as outlined in the Assignment Confirmation.

Section 4.2    **Intentionally Omitted.**

Section 4.3    **Minimal Hours.** MPR reserves the right to require a minimum amount of hours be scheduled per day, to be determined in advance on a per assignment basis. In the event Provider does not work the minimum required amount of scheduled hours for any reason other than dereliction of duties, gross negligence, loss of hospital privileges or other related acts of omission, MPR will bill for, and PCSO will be liable to pay the amount of hours actually worked.

Section 4.4    **Intentionally Omitted.**

Section 4.5    **Holidays.** In addition to any other holiday PCSO facility has set forth, , one and a half times the hourly rate will be charged for the following holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving and Christmas. Notwithstanding the forgoing the only exception to premium hourly rate charges will be with prior approval of MPR and Provider.

Section 4.6

### ARTICLE 5. COMPENSATION

Section 5.1    **Invoices.** Invoices will be detailed as to provider name, dates and times of service, and applicable rate. MPR will submit invoices to PCSO every week for Provider(s) provided to PCSO at the following address:

> **Jim Coats in his capacity as Sheriff of Pinellas County, FL**
> **1400 49th Street North**
> **Clearwater, FL 33762**

Section 5.2    **Payments.** Payment shall be submitted within thirty (30) days of dated invoice to the address set forth on the invoice.

Section 5.3    **Late Payment.** Invoices not paid within thirty (30) days may, at MPR's discretion, accumulate interest in accordance with the Florida Prompt Payment Act.

### ARTICLE 6. CANCELLATION

Section 6.1    **Right to Terminate.** MPR reserves the right to terminate this Agreement at any time. In the event such termination results from PCSO's misrepresentations herein, thirty (30) days written notice shall be provided with an opportunity for PCSO to cure alleged breach during that time.

Section 6.2    **Cancellation.** Once a Provider has been scheduled verbally or in writing (whether or not actually placed in PCSO facility), PCSO must give MPR not less than fifteen  (15) days notice of cancellation prior to the commencement of the assignment. Should PCSO cancel an assignment with less than the required notice set forth above, PCSO agrees to pay MPR the total sum due for the time actually worked by the Provider. .

Copyright 2005-2009
All Rights Reserved

Section 6.3    **Non-Performance.** If PCSO cancels an assignment due to Provider's poor performance, to include, but not be limited to intentional or unintentional dereliction of duties, gross negligence, loss of hospital privileges or other related acts of omissions, PCSO will not be obligated to pay for any uncompleted portion of the assignment. PCSO remains obligated to compensate MPR for time actually worked by provider.

### ARTICLE 7 . NON-SOLICITATION

Section 7.1    **Intentionally Omitted.**

### ARTICLE 8. STANDARDS OF SERVICE

Section 8.1    **Independent Contractor.** As a highly trained professional, the locum tenens Provider will perform professional services as an independent contractor. MPR is interested in the final result of arranging medical coverage and not in making specific medical decisions. The Provider is not an employee of MPR or PCSO for any purpose. Since the Provider is an independent contractor, neither MPR nor PCSO shall make employee social security payments or purchase workers' compensation insurance, unemployment insurance, or health insurance for the Provider provided.

Section 8.2    **Compliance.** PCSO represents that they are not currently under investigation by any local, state or federal governmental agency for Medicare or Medicaid false claims, fraud, or abuse. Further, PCSO represent that its currently practicing Provider(s) and staff have not been sanctioned by a local, state or federal governmental agency, that PCSO and PCSO's currently practicing Provider(s) and staff are not excluded from participating in the Medicare or Medicaid programs, and that no such proceeding is pending. In the event an investigation of PCSO facility is initiated by any local, state or federal governmental agency, or it is discovered by MPR that the representations contained herein are false, MPR reserves the right to immediately terminate this Agreement.

Section 8.3    **Performance Reviews.** MPR is committed to Customer Satisfaction and Risk Management and will periodically review the performance of locum tenens Provider(s) while on assignment. PCSO agrees to assist MPR in this process by providing MPR with meaningful feedback by:

- Include locum tenens Provider(s) placed through MPR in the ongoing Quality Assurance/Risk Management Programs of PCSO facility

- providing necessary materials and reports on the performance of locum tenens Provider(s) to MPR and MPR Customer Service/Risk Management Team, Medical Director, or Corporate Counsel

- promptly advise MPR of any incident or claim involving a locum tenens Provider placed through MPR so MPR can cooperate in its resolution.

Section 8.4    **Record Access.** In instances where PCSO is Medicare and/or Medicaid certified, MPR agrees that in accordance with Section 952 of the Omnibus Budget Reconciliation Act of 1980, its contracts, books, documents and records will be made available to the Comptroller General of the United States, the United States Department of Health and Human Services and their duly authorized representatives ("USDHHS") until the expiration of four (4) years after the date on which such services were furnished under this Agreement.

### ARTICLE 9. GENERAL TERMS

Section 9.1    **Confidential Information.** In the course of accomplishing placement of a health care professional, both MPR and PCSO will receive information, data, items and materials relating to each other's personnel, business plans, methods and techniques, financing, financial condition, customers, lists, accounts, pricing, debts, assets, facilities and marketing, which both parties mutually agree is Confidential Information. MPR and PCSO agree not to disclose the Confidential Information of the other party, to any third party, without the express written consent, either during the term of this Agreement or for two (2) years after its termination. "Confidential Information" does not include information that is (a) generally known in the industry in which MPR and PCSO compete; or (b) is readily ascertainable by proper means by competitors, through sources independent of either PCSO or MPR, or either party's personnel, through no act or no fault of MPR or PCSO.

Section 9.2    **Indemnification.** MPR agrees to indemnify and hold harmless PCSO, its directors, officers, employees, and agents from and against any and all claims, actions, or liabilities which may be

asserted against them by third parties in connection with the negligent performance of MPR, its directors, officers, employees or agents in providing Services under this Agreement.

Section 9.3    **Attorney's Fees.** In the event that either party is required to obtain legal assistance (including in-house counsel) to enforce its rights under this Agreement, or to collect any monies due to such party for services provided, the prevailing party shall be entitled to receive from the other party, in addition to all other sums due, reasonable attorney's fees, court costs and expenses, if any, incurred enforcing its rights and/or collecting its monies.

Section 9.4    **Governing Law; Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to its principles of conflict of laws. Venue for any action related to this Agreement shall be the Courts in and for Pinellas County, Florida, or the Middle District of Florida. Nothing herein shall be deemed a waiver of any rights or responsibilities set forth in Chapter 768, Florida Statutes.

Section 9.5    **Assignment.** Neither party may assign this Agreement without the prior written consent of the other party, nor will consent be unreasonably withheld. No such consent will be required for assignment to an entity owned by or under common control with the assignor. In any event, the assigning party will remain fully responsible for compliance with all of the terms of this Agreement.

Section 9.6    **Non-Discrimination.** Neither MPR nor PCSO will discriminate on the basis of age, race, color, national origin, religion, sex, disability, being a qualified disabled veteran, being a qualified veteran of the Vietnam era, or any other category protected by applicable law.

Section 9.7    **Severability.** In the event that one or more provision(s) of this Agreement is deemed invalid, unlawful and/or unenforceable, then only that provision will be omitted, and will not affect the validity or enforceability of any other provision; the remaining provisions will be deemed to continue in full force and effect.

Intentionally Left Blank

PCSO and MAXIM have acknowledged their understanding of and agree to the mutual promises written above by executing this Agreement as of the Effective Date.

Jim Coats
in his capacity as
Sheriff of Pinellas County, FL

By: _____

Title: Sheriff

Date: 10/5/10

MAXIM PHYSICIAN RESOURCES, LLC

By: _____

Title: Controller

Date: 9/30/10

Federal Tax I.D. # or Social Security #

Copyright 2005-2009
All Rights Reserved

**Jim Coats in his capacity as Sheriff of Pinellas County, FL Office**
**Contract Addendum**

Rate ranges vary depended upon specialty:

Locum, All Inclusive Hourly Rates:

| Specialty | Rates |
|---|---|
| Primary Care | $130/hr all inclusive |
| Dentistry | $130/hr all inclusive |
| Psychiatry | $160/hr all inclusive |

**Conversion and Permanent Placement:** Notwithstanding Section 7.1 of the Agreement, the schedules below shall apply for all Provider conversions and/or permanent placements.

Permanent Placement Pricing:

| Specialty | Conversion Rate |
|---|---|
| All Physicians | $25,000 |

**ON CALL RATES:**

| First Call | |
|---|---|
| Primary Care | $260 |
| Dentistry | $260 |
| Psychiatry | $320 |
| Backup Call | |
| Primary Care | $130 |
| Dentistry | $130 |
| Psychiatry | $160 |

| Jim Coats in his capacity as Sheriff of Pinellas County, FL | MAXIM PHYSICIAN RESOURCES, LLC |
|---|---|
| By: _(signature)_ | By: _(signature)_ |
| Title: Sheriff | Title: Controller |
| Date: 10/7/10 | Date: 9/30/10 |

**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

KATHLEEN HUNT, as Personal Representative
of the ESTATE OF GEORGE ARTHUR HUNT, IV,
              Plaintiff,

                                        Case   No: 8:15-cv-1257-T-33EAJ

vs.

BOB GUALTIERI, in his capacity as Pinellas
County Sheriff; MARIA CRUZ, SHAWN FOX;
GARY PAXSON; AND MAXIM PHYSICIAN
RESOURCES, LLC,
              Defendants.

_____/

# EXHIBIT F
# TO PLAINTIFF'S AMENDED
# COMPLAINT

*1047*



**PHYSICIAN RESOURCES**

## AGREEMENT AMENDMENT

This Amendment (hereinafter "Amendment") to the Services Agreement (hereinafter "Agreement") is entered into this 24th day of April, 2013, by and between **Pinellas County Sheriff's Office ("PCSO")** located at 10750 Ulmerton Road Largo, FL 33778, referred to in this Agreement as "FACILITY," and **Maxim Physician Resources, LLC,** a Maryland limited liability company including its affiliates and subsidiaries, with an office located at 5001 LBJ Freeway Suite 900, Dallas, TX 75244, referred to in this Agreement as "MAXIM."

### RECITALS

**WHEREAS,** FACILITY and MAXIM entered into the Agreement, with an effective date of August 26, 2010.

**WHEREAS,** FACILTY and MAXIM wish to amend the Agreement to incorporate the following terms and conditions.

**THEREFORE,** in consideration of the above premises set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, and intending to be legally bound, FACILITY and MAXIM hereby agree to amend the Agreement to reflect the following terms and conditions.

The following rates shall be applicable as of the Effective Date listed below:

| Service | Rate |
|---------|------|
| On-Call | $300.00 per night |
|  |  |
|  |  |

The terms and conditions of this Amendment are effective as of April 9, 2013. All other terms and conditions will remain unchanged as stated in the Agreement.

FACILITY and MAXIM have acknowledged their understanding of and agreement to the mutual promises written above by executing and delivering this Agreement as of the date set forth above.

PINELLAS COUNTY SHERIFF'S OFFICE

_____
Signature

Bob Gualtieri, Sheriff
Printed Name & Title

5/23/2013
Date

MAXIM PHYSICIAN RESOURCES, LLC

_____
Signature

UEWASH SAGAR   Asst. Controller
Printed Name & Title

04/25/13
Date

Copyright 2013
All Rights Reserved