UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KATHLEEN HUNT, as Personal Representative
of the ESTATE OF GEORGE ARTHUR HUNT, IV,

                  Plaintiff,              Case No.  8:15-cv-1257-T-33EAJ

vs.

BOB GUALTIERI, in his capacity as Pinellas
County Sheriff, MARIA CRUZ; SHAWN FOX;
GARY PAXSON; AND MAXIM PHYSICIAN
RESOURCES, LLC,

                  Defendants.

_____/

## DEFENDANT'S, BOB GUALTIERI, IN HIS CAPACITY AS PINELLAS COUNTY SHERIFF, MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

Defendant, BOB GUALTIERI, in his capacity as Pinellas County Sheriff (hereinafter "SHERIFF"), moves to dismiss Plaintiff's Amended Complaint for failure to state a claim on which relief can be granted under Rule 12(b)(6), Fed.R.Civ.P.  The grounds on which this motion is based are fully set forth in the incorporated Memorandum of Law.

## MEMORANDUM OF LAW

## I.    PROCEDURAL HISTORY AND FACTUAL BACKGROUND

Plaintiff's Amended Complaint filed on October 19, 2015, follows the dismissal of her original Complaint based on Rule 8 violations per Court's Order (Doc. ##56, 61). Exhibit D to the Amended Complaint provides video, and at some locations sound, of various cameras capturing the decedent, George Arthur Hunt, IV (hereinafter "Mr. Hunt"), during the

approximate five hours he was in the Pinellas County Jail following his arrest for driving under the influence.

The Amended Complaint arises from the death of George Arthur Hunt, IV (hereinafter "Mr. Hunt") at the Pinellas County Jail following his arrest for driving under the influence on May 18, 2013. (Doc. #61). Plaintiff, Kathleen Hunt, as Personal Representative of the Estate of George Arthur Hunt, IV, has now filed a 9-count, 41 page Amended Complaint against SHERIFF, two employees - one Deputy and a Nurse – in their individual capacities, Maxim Physician Resources, Inc. and Maxim's employee, Dr. Luis Quinones.[1] Of the nine counts raised, three name SHERIFF in his official capacity: Count IV brought under 42 U.S.C. 1983 for violation of Fourteenth Amendment, labeled by Plaintiff as "Custom and Practice of Deliberate Indifference"), Count V (negligence wrongful death) and Count VI (medical negligence). (Doc. #61).

Plaintiff alleges that following an arrest for driving under the influence, Mr. Hunt was transported to the Pinellas County Jail and arrived at the jail at approximately 8:00 p.m. on May 18, 2015. (Doc. #61, ¶ 23). Plaintiff avers to this Court that SHERIFF's employee, Defendant Nurse Cruz, performed an interview and screening of Mr. Hunt and Mr. Hunt advised Nurse Cruz "he was under a physician's care" and "had been told he suffered from liver problems" and started to become yellow "about a week before." (Doc. #61, ¶ 25).[2] Nurse Cruz described Mr. Hunt as having "generalized jaundice from head to toe." (Doc. #61, ¶ 27). Although Plaintiff does not allege the time when NURSE CRUZ's

---

[1] No "Count III" is included in the Amended Complaint.
[2] The information in Plaintiff's possession, but not pled and therefore outside the four corners of the Amended Complaint and not relied upon by SHERIFF is, however, that Mr. Hunt actually advised he'd "last visited a doctor 8-9 months prior" and the doctor "told him he had liver problems."

screening occurred, the video depicts Mr. Hunt arriving at the room where the medical screening occurred at 9:42 and a wheelchair was obtained for him at 9:50 p.m. (Doc. #61, Ex. D, Case 34, Clip 11). NURSE CRUZ consulted a nurse supervisor. (Doc. #61, ¶ 26) Mr. Hunt was allegedly medically cleared into the Jail at 10:30 p.m. by NURSE CRUZ and the nursing supervisor, and he was assigned to be housed in the medical unit on contact isolation. (Doc. #61, ¶¶ 28, 31).  Nurse Cruz contacted an off-site, on-call physician at approximately 10:30 p.m. and received orders from him for administration of medication and for medical tests to be performed the following day. (Doc. #61, ¶¶38, 41).  Plaintiff alleges that an employee of Maxim Physician Resources, Inc., Dr. Quinones, requested an update on Mr. Hunt's condition and vital signs in one hour but that Nurse Cruz did not follow up. (Doc. #61, ¶¶ 41).

Plaintiff alleges Defendant, Deputy Fox, a detention deputy and not medical staff, "observed" Mr. Hunt's "extreme yellow discoloration" and was aware Mr. Hunt had been cleared by medical for admission to the jail. (Doc. #61, ¶¶ 30, 31).  Plaintiff avers it was "determined" (without identifying who made such determination) that "because of his jaundice Mr. Hunt would be released on his own recognizance to Sunstar" for transport to a hospital or other medical facility as soon as legally possible. (Doc. #61, ¶ 35).  Plaintiff further describes this as a "Plan" which was communicated between two non-party nurses. Plaintiff alleges two deputies placed Mr. Hunt in his cell at approximately 10:50 p.m. and that he was lethargic, unable to move himself from the wheelchair to the bunk and had to be physically lifted by the deputies. (Doc. #61, ¶78).  Plaintiff alleges Deputy Fox had knowledge of Mr. Hunt's serious medical condition but failed to seek medical intervention or

take any action. (Doc. #61, ¶ 80).  After arriving in his cell, at approximately 12:23 a.m., a deputy noticed Mr. Hunt was in the same position and a sergeant was requested to respond. (Doc. #61, ¶ 47).  The "responding deputies apparently concluded among themselves that Mr. Hunt was not breathing" and a medical emergency was called. (Doc. #61, ¶¶ 49, 50).  Medical staff arrived and began performing CPR.  After arrival of outside emergency medical (Sunstar), Mr. Hunt was pronounced dead at approximately 1:03 a.m. on May 19, 2013. (Doc. #61, ¶ 52).  The incorporated video shows emergency medical personnel (Sunstar) arriving at the cell within the jail at 12:41:48. (Doc. #61, Ex. D, Case 39, Clip 5).  At approximately 12:40 a.m. Lt. Campbell authorized Mr. Hunt's ROR "in case he needed to be transported to a medical facility." (Doc. #61, ¶ 51).  The video shows Mr. Hunt had already expired at the time of his ROR.  (Ex. D, Case 39, Clip 4, 12:31:39). (Medical staff can be seen attempting to move his arms, but Mr. Hunt is rigid.)

Plaintiff re-alleges that after Mr. Hunt's death, SHERIFF viewed "the videotape and was advised of the results of the internal affairs investigation which determined no misconduct, breach of policy, procedures, rules occurred." (Doc. #61, ¶¶ 102, 103).  Plaintiff further avers all of the conduct described was undertaken by employees in the course and scope of their employment and that the employees performed these actions under color of state law. (Doc. #61, ¶ 17).

The video attached and incorporated to the Amended Complaint as Exhibit D depicts Mr. Hunt at various locations within the jail on the night of May 18, 2013, showing much of his less than five hours in the jail, some of which has sound.  Portions relevant to the specific claims against SHERIFF are set forth below for the Court's reference:

Case 39, Clip 1, 7:52 p.m. - Mr. Hunt at booking

Case 34, Clip 11, 9:42-9:50 p.m. - Nurses screening room

Case 34, Clip 11, 9:50 p.m. - Wheelchair to screening room

Case 34, Clip 16, 10:32-10:34 p.m. - Mr. Hunt seated upright in wheelchair, Deputy Fox seated in front of him, medical staff approaches Mr. Hunt, gives Mr. Hunt medication, watches him take medication speaking with Mr. Hunt.

Case 34, Clips, 17-19 and Case 39, Clip 3, 10:36-10:44p.m. - Deputy Fox, pushing Mr. Hunt, still seated upright in wheelchair, to medical division.

Case 39, Clip 4      10:50 p.m. - Mr. Hunt in cell on bunk

11:06p.m. -Lights out

12:26:22 - Light shines in cell

12:26:31 - Lights on in cell

12:26:44  - Deputies in cell

12:26:50 - Deputy touches Mr. Hunt

12:26:54 - Deputy observed on radio, emergency called.

12:28:12 - Medical staff arrives in cell (vitals taken).

12:30:18 - Compressions initiated by medical staff.

12:31:39 – Mr. Hunt visibly rigid, medical staff unable to move position of  arm

12:41:48 - Sunstar arrive at cell within the jail facility.


## II.  <u>STANDARD OF REVIEW</u>

In order to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain more than "labels and conclusions[;] a formulaic recitation of the elements of a cause of action will not do." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 677 (2009) (internal quotation omitted) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 545 (2007)).  And, although the well-pled allegations in the complaint are "viewed in the light most favorable to the

plaintiff," <u>Watts v. Fla. Int'l Univ.</u>, 495 F.3d 1289, 1295 (11th Cir. 2007), "factual allegations must be enough to raise a right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 555.   "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." <u>Iqbal</u>, 556 U.S. at 677 (internal quotation omitted).  Even if the facts are well-pled, the court cannot "infer more than the mere possibility of misconduct" if the complaint merely alleges and does not "show" that the pleader is entitled to relief. <u>Id</u>. at 678. The court is "not bound to accept as true legal conclusions couched as factual allegation." <u>Id</u>. "[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." <u>Davila</u>, 326 F.3d 1183, 1185. The Court may grant a motion to dismiss when "on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." <u>Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.</u>, 992 F.2d 1171, 1174 (11th Cir. 1993). Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint when the actual allegations of a complaint will not support the cause of action. Geidel v. City of Bradenton Beach, 56 F.Supp.2d 1359 (M.D. Fla. 1999).

Further, as this Court may draw reasonable inferences from the facts alleged, it is paramount that, pursuant to Rule 11, the representations made to the Court via pleadings and motions alike be formed only after an inquiry reasonable under the circumstances that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Rule 11(b)(3), Fed.R.Civ.P.

Plaintiff's Exhibit D, the video containing views of Mr. Hunt within the jail on the night of his death, was attached to the pleading with approval of this Court and is now incorporated and properly considered for all purposes, including this Motion to Dismiss pursuant to Rule 10(c), Fed.R.Civ.P.

## III.    COUNT IV (42 U.S.C. § 1983)

It remains well settled that "[a] municipality cannot be held liable under § 1983 on a respondeat superior theory" for the actions of municipal employees.   See Monell v. Department of Soc. Servs., 436 U.S. 658, 691 (1978).[3]  H.C. by Hewett v. Jarrard, 786 F.2d 1080, 1086 (11th Cir. 1986) ("It is axiomatic, in section 1983 actions, that liability must be based on something more than a theory of respondeat superior.").  Municipal liability under § 1983 only exists when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that [municipality's] officers."  Id. at 694; see also Quinn v. Monroe County, 330 F.3d 1320, 1325 (11th Cir.2003) (stating that "municipalities may be held liable for the execution of a governmental policy or custom"); Davis v. DeKalb County School Dist., 233 F.3d 1367, 1375 (11th Cir. 2000) ("[R]ecovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' that is, acts which the municipality has officially sanctioned or ordered.") (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 478 (1986)). In order to hold the municipality liable, there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  Snow ex rel. Snow

---

[3]  Plaintiff has alleged no circumstances that would form the basis for a claim of "supervisory liability" as envisioned by Brown v. Crawford, 906 F.2d 667 (11th Cir. 1990).

v. City of Citronelle, AL, 420 F.3d 1262, 1271 (11th Cir. 2005) (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)).

While Monell permits the imposition of government liability in cases where the conduct at issue reflects "practices of state officials so permanent and well settled as to constitute a 'custom or usage' with the force of law," Plaintiff's Amended Complaint continues to fail to identify any such custom or usage, occurring in this case, supported by even the most minimal of facts. Monell, 436 U.S. at 691; Accord McDowell v. Brown, 392 F.3d 1283, 1290 (2004). To establish a custom, it is generally necessary to show a persistent and wide-spread practice and that the municipality had actual or constructive knowledge of such customs. Depew v. City of St. Marys, 787 F.2d 1496, 1499 (11th Cir. 1986). See also Church v. City of Huntsville, 30 F.3d 1332, 1345 (11th Cir. 1994) (holding that demonstration of policy or custom requires that plaintiff show "persistent and widespread practice").

An "isolated incident, however unfortunate," cannot demonstrate evidence of SHERIFF's persistent or widespread policy. McDowell, 392 F.3d at 1290-91. "Considerably more" than the single incident that is the subject of the lawsuit is required "to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." Oklahoma City v. Tuttle, 471 U.S. 808, 824 (1985). See Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1294 (11th Cir. 2004) ("Our precedents are clear that, for constitutional violations to be sufficiently 'widespread' for a governmental supervisor to be held liable, they need occur with frequency . . . ."). See also Mercado v. City of Orlando, 407 F.3d 1152, 1162 (11th Cir. 2005) (holding that there is

8

no municipal liability where plaintiff could not show that any other complaints of excessive force involved factual situations that were substantially similar to plaintiff's incident); MacMillan v. Roddenberry, No. 5:08-cv-351-Oc-10GRJ, 2010 WL 668281, at *3 (M.D. Fla. Feb. 19, 2010), aff'd, 432 Fed. Appx. 890 (11th Cir. 2011) (noting that "the only way [plaintiff] may go forward with this portion of his claim is if he can provide evidence of a widespread custom or practice of excessive force which [defendant] was aware of and permitted to go on").

In the instant case, Plaintiff's claim against SHERIFF is described as a "violation of due process rights guaranteed by the Fourteenth Amendment of the United States Constitution pursuant to 43 (sic) U.S.C. 1983." (Doc. #61, ¶ 88). No other basis for liability under Count IV is pled. Plaintiff avers at paragraph 99 despite the recognition of Mr. Hunt's "apparent and serious medical condition" he was provided "little or no medical care" and that medical care was "withheld and/or delayed" because he "was to be released." (Doc. #61, ¶ 99). It can only be speculated that the alleged "serious medical condition" is either "jaundice," being "extremely yellow," or "liver disease." Plaintiff must identify not only the unconstitutional custom, policy or practice, but that SHERIFF either had actual knowledge of the same or constructive knowledge due to such unconstitutional violation being sufficiently widespread or pervasive that it occurred with some frequency.

Even after this Court provided its detailed Order, Plaintiff fails to identify any existing custom, policy or practice actually occurred or was implemented in this case. Plaintiff states the alleged widespread SHERIFF practice and unwritten policy was "to reduce medical costs by rationing medical care." (Doc #61, ¶ 92) Plaintiff goes on to aver

9

the method by which this alleged practice and unwritten policy was implemented was via the "release on recognizance [of] persons in custody who required further potentially costly medical care and whose release did not appear to pose a threat to public safety." (Doc. #61, ¶ 93).  Plaintiff describes a "not uncommon" practice of release on recognizance (ROR) of persons "who were hospitalized with costly conditions or who were likely to cause the Sheriff to incur costs for their treatment and custody" and that corrections staff would "effectuate the release on recognizance"…or in "other instances prior to Mr. Hunt's death, Sheriff's personnel would approach members of the judiciary to approve the release." (Doc. #91, ¶ 93).  None of these alleged methods by which SHERIFF's claimed 'unwritten policy' of reduction of medical costs by rationing care are alleged to have occurred in Mr. Hunt's case.

By Plaintiff's own allegations, Mr. Hunt was not hospitalized with any costly condition likely to cause the Sheriff to incur costs for treatment and custody. He was in the jail receiving medical care and treatment.  Mr. Hunt's ROR was not even effectuated until 12:40 according to Plaintiff, at a time demonstrated by the video as being after the Code 99, after his death, and upon arrival of emergency medical personnel. (Doc. #61, Ex. D, Case 39, Clips 4 and 5) (Mr. Hunt was officially pronounced dead at 1:03; however, video clearly shows rigor observed as early as 12:26).  No "member of the judiciary" is alleged to have been approached to approve any release. No ROR of a person who required further potentially costly medical care and whose release did not appear to pose a threat to public safety occurred.  Even if Plaintiff's unsubstantiated "unwritten policy" existed, it did not occur nor was it implemented in this case, in any form or fashion.

Plaintiff, not only fails to show this "unwritten" and "widespread" unconstitutional policy occurred in this case, but despite this Court's specific instructions, also fails to allege a singular factually similar instance of this alleged practice/custom, if it did exist at all, to have occurred prior to May 18, 2013.  Plaintiff broadly states this unwritten practice existed but claims to be unable to provide any specifics due to federal privacy laws or "HIPPA."  The undersigned is aware of no binding 11th Circuit authority which excuses the failure to allege specific, prior instances of factually similar unconstitutional conduct by hiding behind "HIPPA."  To attempt to use these mystery occurrences as the sword in order to state a basis for a claim for relief so as to overcome a motion to dismiss under § 1983, while also attempting to use this federal privacy regulation as the shield for excusing her complete failure to provide even <u>one</u> factually similar occurrence, should not be tolerated.  Such failure to plead any factually similar instance of this "unwritten policy" is not supported by any Eleventh Circuit precedent of which the undersigned is aware.

Notwithstanding the foregoing fatal defects to Plaintiff's claim for relief against SHERIFF, Plaintiff alleges a "Plan" was formulated by two non-party, employee nurses. (Doc. #61, ¶ 35).  The "Plan" is claimed to have been to ROR Mr. Hunt to Sunstar EMS as soon as it was legally possible.  By Plaintiff's own allegations, and the video attached to Plaintiff's Amended Complaint, even in the light most favorable to Plaintiff, Mr. Hunt was not ROR'd until after EMS actually arrived on scene. (ROR authorized by Lt. Campbell at 12:40 a.m. (Doc. #61, ¶ 51); EMS seen arriving at Mr. Hunt's location within the jail facility 12:41:48 (Doc. #61, Ex. D, Case 39, Clip 4).  Mr. Hunt had already expired at the time he

was ROR'd.   Neither nurse was alleged to have communicated this "Plan" to anyone, including the person who actually ROR'd Mr. Hunt upon arrival of EMS.

Further, absolutely no allegation is made, as no facts exist to support the same, that any employee made any decisions to "ration medical care" or "reduce medical costs."  Quite the contrary, the allegations demonstrate Mr. Hunt received medical care, including the administration of prescription medication and ordering of tests for the following day.  Mr. Hunt was seen by trained medical staff and was assigned to the dedicated medical division of the jail.  He was scheduled for further medical treatment and tests, as ordered by Maxim's on-call physician, for the following day.  No allegations show a singular decision was made by any SHERIFF employee based upon any financial reason, the consideration of a budget or the cost of any medical care, received or anticipated.  The allegations of the Amended Complaint demonstrate that all medical staff attending to Mr. Hunt were proceeding via providing treatment which would, in fact, result in incurring, not avoiding, costs.

Plaintiff includes an allegation regarding how the SHERIFF "makes the budget" and "reduces costs".  As a constitutionally elected officer, SHERIFF must do just that - be fiscally responsible with the Pinellas County taxpayers' resources.  Even assuming SHERIFF did reduce medical costs or reduce any budget, no link exists, nor is any pled, between such fiscal responsibility and any constitutional violations. No link between SHERIFF's alleged fiscal responsibility and the alleged uncommunicated "Plan" of two nurses to call EMS upon Mr. Hunt's release eight hours after his arrival, is pled or exists.  This is especially egregious as the non-party nurse's alleged "Plan", in fact, affirmatively pled to have not occurred at all.  Nor is this "Plan" alleged to have been motivated by or made in consideration of any

financial or budgetary reasons shared by SHERIFF.  This "Plan," not shared with or articulated to anyone, is not alleged to have been made pursuant to or under any policy, practice or custom.  Nowhere are facts alleged to demonstrate the "Plan," even if implemented at all on the night in question, resulted in the rationing of any medical care to Mr. Hunt.

Plaintiff certainly avers dissatisfaction with the rendering of the medical care and treatment to Mr. Hunt at the jail.  Such is the gravamen of a state, medical malpractice action brought under Florida Statutes, not a federal suit brought under §1983.  Such state claim, if not likewise dismissed, could arguably be properly dealt with in state court upon this Court declining to exercise jurisdiction over the state claims in the absence of pending federal claims.  Plaintiff does not, however, allege any factual basis whatsoever to support that the alleged practice of "reducing medical costs by rationing medical care" or the described method of accomplishing/implementing this practice by RORing persons who require potentially costly medical care occurred at any time on the night in question or any time in history.  The federal claims against SHERIFF are properly dismissed, with prejudice.

Additionally, in complete disregard of the Court's dismissal of Plaintiff's claims for relief based on her "ratification theory," Plaintiff again pleads such theory, alleging the 'unwritten policy,' was SHERIFF's actual policy and that SHERIFF was aware of these "practices and behaviors." (Doc. #61, ¶¶92,102).  Plaintiff's conclusory statement is once again unsupported by any facts other than to superficially allege he "ratified, endorsed and acquiesced" the violations after they occurred and after Mr. Hunt's death. (Doc. #61, ¶ 102, 103).  This ratification, as it was upon the filing of the original Complaint, provides no basis

for liability against SHERIFF in light of the facts and circumstances alleged even in light most favorable to Plaintiff. See, <u>Salvato v. Miley</u>, 25 Fla.L.Weekly Fed. C1333a (11th Circuit, June 25, 2015)(Confirming even the failure to investigate a single incident, of which the sheriff was unaware until after-the-fact, cannot ratify a constitutional violation).  Plaintiff has failed to show SHERIFF had the opportunity to ratify the employees' unconstitutional decisions *before* they became final.  <u>Id.</u> citing <u>Thomas ex rel. Thomas v. Roberts</u>, 261 F.3d 1160 (11th Cir. 2001).  To the extent Plaintiff alleges only this single incident, if at all, it cannot be relied upon to support Count IV. <u>Id.</u> (emphasis added).

Finally, out of an abundance of caution although not pled, if Plaintiff is attempting to allege a failure to train or supervise the two nurses whose alleged "Plan" is the basis for the alleged constitutional claim against SHERIFF, absolutely nothing in the Complaint supports an allegation that SHERIFF knew of a need to train, supervise, or discipline in any respect but, nevertheless, elected not to take any action. See <u>Gold v. City of Miami</u>, 151 F.3d 1346, 1350 (11th Cir. 1998) (holding that to establish municipality's deliberate indifference, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action"); <u>Wright v. Sheppard</u>, 919 F.2d 665, 674 (11th Cir. 1990).  See also <u>West v. Tillman</u>, 496 F.3d 1321, 1329 (11th Cir. 2007) ("The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.").  Plaintiff is incapable of demonstrating what is required, "that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." <u>Brown</u>, 520 U.S. at 403.

Plaintiff has failed, based upon any well-pled facts, to state any claim for relief against SHERIFF in his official capacity. Plaintiff's Count IV, is an attempt at an end-around Monell's prohibition of municipal liability on a respondeat superior theory for the actions of municipal employees, the two nurses whose "Plan" was allegedly implemented.  As to Plaintiff's alleged financially, non-medically motivated policy of rationing medical care in order to save money, Plaintiff has again failed to state any cognizable federal claim, supported by any facts, to show this unwritten policy occurred under any factually similar instances in the past, or that it occurred in the instant case.

Plaintiff's now 41-page Amended Complaint continues to demonstrate no entitlement to relief has been pled, or can be pled and further amendment is absolutely futile. Having previously amended and failed, with the Court's specific guidance and instructions, Count IV against SHERIFF should, as a matter of law, dismissed with prejudice.

**IV.    COUNTS V AND VI (Negligence and Medical Negligence)**

Count V, previously Count III, is labeled "General Negligence of Defendant Gualtieri resulting in Wrongful Death" and again incorporates paragraphs containing factual averments related to only the alleged constitutional claims against the individual employees, alleged medical negligence and solely to co-defendants, Maxim Physician Resources, Inc. or Dr. Quinones.  It is a general negligence claim brought pursuant to Florida Statutes and remains one not grounded in medical negligence or medical malpractice.

Count V, however, continues specifically to identify as alleged breaches of SHERIFF's duty owed to Plaintiff failures attributable and actionable only under a medical negligence claim.  For example, Plaintiff alleges SHERIFF, via the action/inaction of non-

medical personnel failed to "use reasonable care in the intake screening of Decedent." Plaintiff's own factual allegations, however, show the only intake screening performed on Mr. Hunt was by medical personnel.  Plaintiff also continues to allege non-medical personnel failed to "use reasonable care in the evaluation of the Decedent's medical condition" – care that by her own allegations, and Florida law, detention deputies do not, nor can they, provide. Another example is alleged breach of duty by detention staff members in their "evaluation of whether Decedent should be transported to an emergency medical facility for crucial medical evaluation and treatment."  (Doc. #61, ¶ 114, a-g). Detention staff do not, nor may they under Florida law, provide medical evaluation and treatment; therefore, no failure to provide the same could ever provide the basis for Count V.

Failures of employees to provide medical care, medical treatment or medical evaluations are not breaches of duty sounding in general negligence but only arguably medical negligence if at all. The purported action or inaction of non-medical employees, specifically detention deputies, cannot form the basis for general negligence for failures to provide medical evaluations or care.

Lastly, to the extent Plaintiff's wrongful death claim is based on SHERIFF's alleged negligence with regard to training or failing to train its employees, if at all, Count V fails to state a claim for relief.  Insofar as SHERIFF's alleged negligence pertains to policy decisions regarding what to include in the training of deputies, the claim is barred by the judicially created discretionary function exception to section § 768.28's waiver of sovereign immunity. See, Lewis v. City of St. Petersburg, 260 F.3d 1260, 1266 (11th Cir.2001) (explaining that "[a] city's decision regarding how to train its officers and what

subject matter to include in the training is clearly an exercise of governmental discretion regarding fundamental questions of policy and planning" and therefore a claim challenging such a decision is barred by the discretionary function exception to the waiver of sovereign immunity in section § 768.28, Fla.Stat.).   To the extent Plaintiff alleges negligence in the implementation of training, no allegation has been made supported by facts as to any such negligence.   To the extent Plaintiff has based a general negligence claim on alleged constitutional violations, SHERIFF cannot be vicariously liable for the actions of employees. Monell, 436 U.S. 658, 691 (1978).   As stated above, without any allegations supporting the existence of any municipal policy causing any constitutional violation, any wrongful death claim based on the same constitutional violations likewise fail. Burkes v. Beary, 713 F.Supp.2d 1350 (M.D. Florida, Orlando Division April 29, 2010)(No showing by estate of similar incidents involving similar facts, as required for sheriff to be liable in his official capacity, summary judgment granted.)

Count VI, based solely on "Medical Negligence," is Plaintiff's second attempt to plead a standard medical malpractice claim pursuant to Chapter 766, Florida Statutes, but her claim for relief suffers from the same deficiencies as the general negligence claim.   In Florida, medical negligence (or medical malpractice) is "a claim, arising out of the rendering of, or the failure to render, medical care or services." Christie v. Lee County Sheriff's Office, 2011 WL 4501953 (M.D. Florida, Ft. Myers Division) citing Florida Statute § 766.106(1) and Tenent South Florida Helath Systems v. Jackson, 991 So.2d 396, 399 (Fla.3d DCA 2008).   "In any action for recovery of damages based on the death ... of any person in which it is alleged that such death or injury resulted from the negligence of a health care provider ...

the claimant shall have the burden of proving by the greater weight of evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider." Id.

Count VI, like all of Plaintiff's claims, incorporates paragraphs entirely unrelated to a claim for medical negligence, paragraphs unrelated and irrelevant to the rendering of any medical care. Plaintiff also improperly attempts to hold SHERIFF vicariously liable for the "negligent acts of his staff, agents and/or employees," non-medical employees and non-employees under her medical malpractice theory.  Plaintiff identifies alleged breaches of a prevailing professional standard of care in the care and treatment of Mr. Hunt based on facts in Plaintiff's possession which cannot be attributed to any SHERIFF medical personnel.  For example, Plaintiff states the professional medical standard of care was breached at paragraph 124(b) by "ignoring Mr. Hunt's rapidly deteriorating medical condition including his significant reduction in ambulation and lethargy." Nurse Cruz is only alleged to have observed Mr. Hunt at intake while performing her screening. (Doc. #61, ¶ 25). The video shows she was not present when Mr. Hunt initially arrived at the jail in booking. (Doc. #61, Ex. D, Case 39, Clip 1). The video also shows Mr. Hunt at the medical screening receiving the requested wheelchair due to Mr. Hunt being "unsteady on his feet." (Doc. #61, ¶ 29; Ex. D, Case 34, Clip 11, 9:42-9:50).  The only medical personnel who engaged with Mr. Hunt after screening, in fact, administered medication, observed Mr. Hunt take such medication and speak with Mr. Hunt. (Doc. #61, Ex. D, Case 34, Clip 16, 10:33).  It is not alleged any medical personnel ever observed Mr. Hunt's ambulation after he was "unsteady on his feet" and seated in the wheelchair   No medical personnel is alleged to have seen Mr. Hunt in the

cell after being taken to medical division.  No medical personnel is alleged to have been summoned to his cell yet failed to seek medical intervention. As such, there are no facts to support any medical staff, "ignored Mr. Hunt's rapidly deteriorating medical condition."

Another such example of Plaintiff's attempt to base her medical malpractice claim on conduct of non-medical personnel is paragraph 124(f) wherein one of the alleged negligent medical breaches is identified as a "failure to provide reasonable first response care to Mr. Hunt including basic cardio-pulmonary resuscitation." (Doc. #61, ¶ 124).  However, the facts incorporated and video attached as Exhibit D specifically demonstrate only non-medical employees (i.e. Deputies), none of whom are subject to the same prevailing professional standard of care for healthcare providers, allegedly "failed to perform CPR." (Doc. #61, Ex. D, Case 39, Clip 5).  Plaintiff specifically incorporates and avers that deputies "stood about the cell essentially doing nothing until members of the medical staff arrived." (Doc. #61, ¶ 50).  It is detention deputies, not a single medical staff member, who is alleged to have failed to commence or properly perform CPR.  In fact, Plaintiff alleges medical personnel, including specifically SHERIFF's medical staff and outside emergency medical personnel, arrived but their efforts were unsuccessful in reviving Mr. Hunt.  (Doc. #61, ¶ 52). No deficiency with the care or treatment provided by responding medical personnel is raised.

Plaintiff's medical negligence claim is pled unburdened by supporting facts.  Her attempt to base or support medical negligence upon the actions or inaction of non-medical staff or employees, even if their conduct was negligent, does not, nor will it ever, support Plaintiff's claim.  Reliance upon the action or inaction of detention deputies (or non-employees), none of whom are, or can be, held to the standard of care for a health care

provider in the care or treatment of an inmate such as Mr. Hunt, renders Count VI subject to dismissal.  The reasonable man standard of general negligence is inapplicable to Count VI which necessarily relies upon the higher standard of care due to the rendering of, or failure to render, medical care or services and Plaintiff's medical negligence claim.

Finally, Florida Statute § 766.102 only applies to "a claim, arising out of the rendering of, or the failure to render, medical care or services." Christie, 2011 WL 4501953 (M.D. Florida, Ft. Myers Division) citing Florida Statute 766.106(1) and Tenent, 991 So.2d 396, 399 (Fla.3d DCA 2008).  Plaintiff's claim may not stand on facts wholly unrelated to the actual rendering of, or failure to render, medical care or services.  Among Plaintiff's various alleged breaches of the prevailing professional standard of care identified in paragraph 124, she avers SHERIFF was negligent by "failing to insure" Dr. Quinones was licensed. (Doc. #2, ¶ 124(a)).  SHERIFF raised this and the other identical failures in its Motion to Dismiss the original Complaint.  Plaintiff chose to replead without amendment. This allegation, even if true, does not raise any failure in the rendering of medical care to Mr. Hunt. See, § 766.102, Fla.Stat.  Plaintiff's Count VI does not state any viable claim for medical negligence upon which relief can be granted and is properly dismissed.

## V.    CONCLUSION

Plaintiff, despite the Court's Order providing clear guidance as to the sufficiency and standard by which the SHERIFF claims must be judged and giving Plaintiff an opportunity to file an Amended Complaint, fails to satisfy the plausibility standard and the Amended Complaint remains devoid of the requisite factual allegations to rise above legally insufficient speculation and conjecture.  The claim against SHERIFF has not overcome the

absolute legal impediments, as it relates to a § 1983 suit brought against a governmental agency (an official capacity suit) based on well pled, non-conclusory allegations.  For the reasons set forth above, the Court should dismiss Plaintiff's Complaint against BOB GUALTIERI, in his official capacity as Sheriff of the Pinellas County, Florida, with prejudice.

WHEREFORE, Defendant, BOB GUALTIERI, in his capacity as Pinellas County Sheriff, respectfully requests this Honorable Court dismiss the Amended Complaint, with prejudice, and for such other relief as is just and proper

*[Remainder of page intentionally left blank]*

**<u>CERTIFICATE OF SERVICE</u>**

**I HEREBY CERTIFY** that on November 5, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to those participants.

/s/ Nicole E. Durkin                
NICOLE E. DURKIN
Sr. Associate Counsel
FBN 0078069
10750 Ulmerton Road
Largo, FL  33778
NDurkin@pcsonet.com
Amarcott1@pcsonet.com
Telephone: (727) 582-6274
Fax: (727) 582-6459
Attorney for Defendant Bob Gualtieri, Maria Cruz, Shawn Fox

-and-

Donna J. Fudge, Esquire
Fudge & McArthur, P.A.
650 – 16 Street North
St. Petersburg, FL  33705
Attorney for Defendants, Bob Gualtieri, Maria Cruz, Shawn Fox
