UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KATHLEEN HUNT,

       Plaintiff,

v.                        Case No. 8:16-cv-509-T-33AAS

BOB GUALTIERI, et al.,

       Defendants.
_____/

## ORDER

    This cause comes before the Court pursuant to Defendant Maxim Physician Resources, LLC's Motion to Dismiss (Doc. # 3) and Defendant Sheriff Bob Gualtieri's Motion to Dismiss (Doc. # 4), both filed on March 2, 2016. Plaintiff, Kathleen Hunt, as Personal Representative of the Estate of George Arthur Hunt, IV, filed a responses to Maxim's Motion (Doc. # 5) and Sheriff Gualtieri's Motion (Doc. # 6). For the reasons that follow, the Court denies Sheriff Gualtieri's Motion and grants in part and denies in part Maxim's Motion.

## I.   Background

    On May 18, 2013, following an arrest for driving under the influence, Mr. Hunt was transported to the Sheriff's Office breathalyzer facility and then to Pinellas County Jail. (Doc. # 1 at ¶¶ 21-22). Mr. Hunt arrived at Pinellas

County Jail at approximately 8:00 P.M. on the evening of May 18, 2013. (Id. at ¶ 23). Thereafter, a Sheriff's employee, Nurse Cruz of the Pinellas County Jail medical staff, performed an interview and screening of Mr. Hunt. (Id. at ¶ 25). At that time, Mr. Hunt advised Nurse Cruz that he was under a physician's care, had been told he suffered from liver problems, and had started to become yellow about a week before. (Id.)

The Amended Complaint alleges Nurse Cruz consulted with a nurse supervisor about Mr. Hunt's condition. (Id. at ¶ 26). Nurse Cruz described Mr. Hunt as having "very obvious" yellow coloring with jaundice, "a tongue strawberry in color," and "generalized jaundice from head to toe." (Id. at ¶ 27). Despite her knowledge of the duration and severity of Mr. Hunt's jaundiced condition, Nurse Cruz and her supervisor cleared Mr. Hunt for admission to the jail at approximately 10:30 P.M. (Id. at ¶¶ 28).

Subsequently, Mr. Hunt became "unsteady" and was given a wheelchair. (Id. at ¶ 29). Deputy Fox saw Mr. Hunt and described his extreme yellow discoloration as the worst he had ever seen. (Id. at ¶ 30). Mr. Hunt was assigned to a medical unit, in a single cell, isolated from contact with others because of his profound jaundice. (Id. at ¶ 32). In

addition, the supervising nurse determined that Mr. Hunt should be released on his own recognizance to a hospital emergency room as soon as it was legally possible to do so. (Id. at ¶ 35).

At approximately 10:30 P.M., Nurse Cruz contacted the off-site, on-call physician, Dr. Quinones, by telephone regarding Mr. Hunt's medical condition. (Id. at ¶ 38). Dr. Quinones is a physician who provided medical services on a temporary basis to the jail, pursuant to its contract with Dr. Quinones' employer, Maxim. (Id. at ¶¶ 18-19). Maxim contracted with Sheriff Gualtieri "to provide fully licensed and skilled on-call physicians to provide medical care to the inmates at the Pinellas County Jail." (Id. at ¶ 128). Although Maxim employed him as an on-call physician, Dr. Quinones "was only licensed to practice in an area of critical need for the Florida Department of Corrections under the supervision of its physicians and was never licensed to practice for [Maxim], [Sheriff Gualtieri] or at the Pinellas County Jail." (Id. at ¶ 133).

During his phone call with Nurse Cruz, Dr. Quinones ordered medications for Mr. Hunt and directed that Nurse Cruz call back in one hour with an update on Mr. Hunt's condition and vital signs. (Id. at ¶¶ 41, 63). Despite Dr. Quinones's

3

orders to re-check Mr. Hunt at approximately 11:30 P.M., Nurse Cruz ignored those orders and did nothing. (Id. at ¶ 65).

When Mr. Hunt was placed in the cell in the medical unit at approximately 10:50 P.M., his condition had very rapidly declined to the point "he was extremely lethargic and unable to move himself from the wheelchair onto the bunk or assist the deputies in any way in doing so." (Id. at ¶ 33). Deputy Fox and Corporal Paxson had to lift Mr. Hunt into his bunk. (Id. at ¶ 33). Although Mr. Hunt was suffering from an "obvious and serious medical condition that required immediate medical intervention," Deputy Fox and Corporal Paxson failed to seek medical intervention or to take any other action. (Id. at ¶ 34).

At approximately 12:23 A.M., deputies noticed that Mr. Hunt had not moved at all in his bunk. (Id. at ¶ 47). Sergeant Holderbaum was requested to assist in a welfare check of Mr. Hunt. (Id.) Sergeant Holderbaum, Corporal Paxson, and Deputy Mobley entered Mr. Hunt's cell and concluded that Mr. Hunt was not breathing. (Id. at ¶¶ 48, 49). Despite their training in cardio pulmonary resuscitation (CPR), Corporal Paxson, Sergeant Holderbaum, and Deputy Mobley did not check Mr. Hunt's pulse, commence CPR, or intervene in any other way. (Id. at ¶ 50). Instead, they called a medical emergency and

4

did nothing until members of the medical staff arrived. (Id.)

At approximately 12:40 A.M. on May 19, 2013, Lt. Campbell authorized Mr. Hunt to be released on his own recognizance for transportation to a medical facility. (Id. at ¶ 51). Shortly thereafter, paramedics were called, but the jail medical staff and emergency medical personnel could not revive Mr. Hunt. (Id. at ¶ 52). Mr. Hunt was pronounced dead at approximately 1:03 A.M. on May 19, 2013. (Id.).

On May 15, 2015, Mr. Hunt's personal representative, Kathleen Hunt, initiated an action in state court against Sheriff Gualtieri, Maxim, and three Sheriff's employees, Nurse Cruz, Deputy Fox, and Deputy Paxson, which was removed to this Court as Hunt v. Gualtieri, No. 8:15-cv-1257-T-33EAJ. On October 5, 2015, this Court dismissed the claims against Maxim without prejudice and granted Hunt leave to amend. Hunt v. Gualtieri, Doc. # 55, No. 8:15-cv-1257-T-33EAJ (M.D. Fla. Oct. 5, 2015). On October 19, 2015, Hunt then filed the operative forty-two page, nine-count Amended Complaint, which also includes Dr. Quinones as a defendant. Id. at Doc. # 61.

Subsequently, on March 2, 2016, this Court bifurcated Counts IV-X against Sheriff Gualtieri, Maxim, and Dr. Quinones, from the original action and stayed this action. Id. at Doc. # 104. After the disposition of the original

5

action, this action was reopened on August 22, 2016. (Doc. #
9). Thus, the only counts currently before this Court are
Counts IV-X against Sheriff Gualtieri, Maxim, and Dr.
Quinones. The Motions are ripe for review.

## II.  **Legal Standard Fed. R. Civ. P. 12(b)(6)**

On a motion to dismiss, this Court accepts as true all
the allegations in the complaint and construes them in the
light most favorable to the plaintiff. Jackson v. BellSouth
Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004). Further,
this Court favors the plaintiff with all reasonable
inferences from the allegations in the complaint. Stephens v.
Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th
Cir. 1990)("On a motion to dismiss, the facts stated in [the]
complaint and all reasonable inferences therefrom are taken
as true.").

However, the Supreme Court explains that:

> While a complaint attacked by a Rule 12(b)(6)
> motion to dismiss does not need detailed factual
> allegations, a plaintiff's obligation to provide
> the grounds of his entitlement to relief requires
> more than labels and conclusions, and a formulaic
> recitation of the elements of a cause of action
> will not do. Factual allegations must be enough to
> raise a right to relief above the speculative
> level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)(internal
citations omitted). Further, courts are not "bound to accept

6

as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986).

In accordance with Twombly, Federal Rule of Civil Procedure 8(a) calls "for sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Twombly, 550 U.S. at 570). A plausible claim for relief must include "factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

Further, "[a]fter Iqbal it is clear that there is no 'heightened pleading standard' as it relates to cases governed by Rule 8(a)(2), including civil rights complaints. All that remains is the Rule 9 heightened pleading standard." Randall v. Scott, 610 F.3d 701, 710 (11th Cir. 2010).

**III. Analysis**

Hunt brings seven counts against Sheriff Gualtieri, Maxim, and Dr. Quinones. The counts against Sheriff Gualtieri, in his official capacity as Sheriff of Pinellas County, include: Count IV under 42 U.S.C. § 1983, Count V for medical negligence, and Count VI for general negligence. The counts against Maxim include: Count VII for breach of contract, Count VIII for general negligence, and Count IX for

medical negligence. The one count against Dr. Quinones, Count X, is for medical negligence. The Court addresses the claims in turn.

### A. Count IV, 42 U.S.C. § 1983 against Sheriff Gualtieri

It is well-established that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403 (1997). Rather, to recover damages from the Sheriff under § 1983, Hunt must show: "(1) that [his] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir.2004)(citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)).

This Court has already determined in the companion case that the Amended Complaint sufficiently pleads the existence of a constitutional violation. Hunt v. Gualtieri, No. 8:15-cv-1257-T-33EAJ, 2016 WL 1077361, at *3 (M.D. Fla. Mar. 18, 2016)("Plaintiff has properly alleged the violation of Mr. Hunt's constitutional rights under the Fourteenth Amendment."). Thus, Sheriff Gualtieri focuses his argument on the second and third elements.

A plaintiff seeking to impose liability on a municipality under § 1983 must identify a particular municipal "policy" or "custom" that caused the constitutional injury. Bd. of Cty. Comm'rs of Bryan Cty., 520 U.S. at 403.

> A policy is a decision that is officially adopted
> by the municipality, or created by an official of
> such rank that he or she could be said to be acting
> on behalf of the municipality. . . . A custom is a
> practice that is so settled and permanent that it
> takes on the force of law.

Wayne v. Jarvis, 197 F.3d 1098, 1105 (11th Cir. 1999) (quoting Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997)); see also Griffin v. City of Opa-Locka, 261 F.3d 1295, 1307 (11th Cir. 2001). Hunt must show that a county policy or custom was the "moving force" that caused the alleged constitutional violation in order to establish Sheriff Gualtieri's § 1983 liability. McElligott v. Foley, 182 F.3d 1248, 1259 (11th Cir. 1999); Young v. City of Augusta, GA., 59 F.3d 1160, 1171 (11th Cir. 1995).

First, Sheriff Gualtieri contends that Hunt has not sufficiently pled similar circumstances to establish a policy or custom of the Sheriff's releasing sick inmates to avoid health care costs. While the Amended Complaint states that the implementation of the alleged policy was "not uncommon" and "happened numerous times" prior to Mr. Hunt's death, Hunt

acknowledges that she "is unable to provide the specific names of any other similarly situated persons." (Doc. # 1 at ¶ 96).

Case law cited by Sheriff Gualtieri underscores the importance of similar events to establishing a municipal entity's policy or custom. See, e.g., Mercado v. City of Orlando, 407 F.3d 1152, 1162 (11th Cir. 2005)(affirming summary judgment for City because "[d]uring discovery, [plaintiff] was given a list of all cases involving excessive force, but he cannot show that any of them involved factual situations that are substantially similar to the case at hand"); McDowell v. Brown, 392 F.3d 1283, 1290-91 (11th Cir. 2004)("Simply put, this isolated incident, however unfortunate, does not demonstrate evidence of the County's 'persistent' or 'widespread' policy of understaffing the Jail so as to delay the transfer of inmates to Grady."); MacMillan v. Roddenberry, No. 5:08-cv-351-Oc-10GRJ, 2010 WL 668281, at *3 (M.D. Fla. Feb. 19, 2010)(granting summary judgment for Sheriff where "none of the complaints [of other excessive force incidents] presented here involved factual situations that are substantially similar to the case at hand"). But the cases cited by Sheriff Gualtieri were decided at the summary judgment stage, after the plaintiffs had the benefit of discovery to establish a pattern of similar incidents.

Thus, while Sheriff Gualtieri's point is well taken, his argument is more appropriate at the summary judgment stage after Hunt has had the opportunity for discovery. See Holder v. Gualtieri, No. 8:14-cv-3052-T-33JSS, 2015 WL 4079844, at *4 (M.D. Fla. July 6, 2015)("As the existence of such a custom is largely a fact-based issue, the Sheriff's arguments would be better suited at the summary judgment stage when Holder has been afforded additional discovery."). Hunt alleges that the release of sick inmates to avoid medical costs was "not uncommon," and, in fact, was a "pervasive and longstanding" policy. (Doc. # 1 at ¶¶ 96-97). For this stage, "[p]leading on information [and] belief is still permissible where, as here, the facts are 'peculiarly within the possession and control of the defendant.'" Belik v. Carlson Travel Grp., Inc., 864 F. Supp. 2d 1302, 1311 (S.D. Fla. 2011)(quoting Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010)).

Furthermore, the Amended Complaint recites the cost-cutting history of the Sheriff's Department, as well as Sheriff Gualtieri's comment that "In reality, most inmates can't pay" to reimburse the Sheriff for their medical costs, which arguably displays a hostility towards paying for inmate medical care. (Doc. # 1 at ¶¶ 91-93); see also Jenkins v.

11

Manatee Cty. Sheriff, No. 8:13-cv-2796-T-30TGW, 2014 WL
105133, at *5 (M.D. Fla. Jan. 10, 2014)(denying motion to
dismiss because "Plaintiff alleges that it was [Defendant's]
widespread custom, policy, and practice to save money by
discouraging its staff from referring inmates with complaints
of serious medical conditions to its physicians and outside
medical practitioners or facilities for examination and/or
treatment").

Viewing the allegations in the light most favorable to
Hunt, the Court finds that Hunt has sufficiently pled the
existence of a policy or custom within the Sheriff's
Department. Cf. Buckley v. Barbour Cty., Ala., 624 F. Supp.
2d 1335, 1343-44 (M.D. Ala. 2008)("But even if a policy or
custom which is not unconstitutional on its face requires
"'considerably more proof than the single incident'" to infer
a policy or custom, the County's argument is more appropriate
at the summary judgment stage. The allegations blaming the
County's wider practice or custom to forego training, thus,
amount to more than speculation, and the § 1983 claim against
the County will survive a motion to dismiss.").

Nevertheless, Sheriff Gualtieri contends that, even if
such a policy or custom of releasing inmates to avoid medical
costs did exist, Mr. Hunt's death was not caused by that

12

policy. (Doc. # 4 at 10). Mr. Hunt stopped breathing, and likely died, while still in the custody of the Pinellas County Jail. (Id.). Furthermore, Sheriff Gualtieri emphasizes that the jail staff provided Mr. Hunt with medication and a wheelchair, and placed him in a medical cell for closer observation. (Id. at 18). Thus, Mr. Hunt received medical care in the jail, where he ultimately died without having been released on his own recognizance. Therefore, Sheriff Gualtieri reasons, a policy of releasing sick inmates before sending them to the emergency room could not be the cause of Mr. Hunt's death.

Hunt replies that Mr. Hunt's death was caused by the policy of releasing the sickest prisoners on their own recognizance in order to ration health care, even though Mr. Hunt was not released until after deputies found him unresponsive and called a medical emergency. Specifically, Hunt contends that jail employees delayed further treatment of Mr. Hunt because they intended to release Mr. Hunt within a short time, in accordance with the alleged policy. (Doc. # 1 at ¶ 95). Furthermore, Hunt alleges that the deputies and staff of the jail did not perform in-person welfare checks on Mr. Hunt, instead using less costly video surveillance, which did not provide sufficient detail of Mr. Hunt to alert staff

that medical intervention was necessary. (Doc. # 1 at ¶ 114); see also Nam Dang v. Sheriff of Seminole Cty., Fla., 38 F. Supp. 3d 1333, 1340 (M.D. Fla. 2014)("It is alleged that the lack of suitable training and staffing of medical personnel at the jail was the result of deliberate cost-cutting efforts by the Sheriff. Accordingly, the allegations of the Amended Complaint are sufficient to sustain a § 1983 claim against the Sheriff."). According to Hunt, that limited observation and delay in treatment were the cause of Mr. Hunt's death. (Doc. # 1 at ¶¶ 99-101).

At the motion to dismiss stage, the Court finds that Hunt has sufficiently pled a purported policy of releasing prisoners to avoid medical costs that resulted in the allegedly sub-standard medical care and observation Mr. Hunt received at the Pinellas County Jail. See Holder, 2015 WL 4079844, at *4 ("While the Sheriff contends that no facts have been asserted to sustain a claim under section 1983 municipal liability, the Court finds that Holder has satisfied his burden, at this stage, of alleging a custom or usage with force of law."). If these allegations are established, Hunt will have shown that Sheriff Gualtieri maintained a custom sufficient to create municipal liability. See Fundiller v. City of Cooper City, 777 F.2d 1436, 1443

(11th Cir. 1985)("The complaint states that the City of Cooper City has a custom of allowing the use of excessive force. If established, this allegation provides the requisite fault on the part of the City . . . thereby establishing a 'custom' within the meaning of <u>Monell</u>.").

**B. <u>Counts V and VI, General and Medical Negligence against Sheriff Gualtieri</u>**

Florida Statutes Section 766.106 defines a claim for "medical negligence" or "medical malpractice" as "a claim arising out of the rendering of, or the failure to render, medical care or services." Fla. Stat. § 766.106(1)(a). Section 766.202(7) further defines "medical negligence" as "medical malpractice, whether grounded in tort or contract." Fla. Stat. § 766.202(7). "In order to qualify as a medical malpractice claim, the wrongful act alleged 'must be directly related to the improper application of medical services and the use of professional judgment or skill.'" <u>Horst v. Parker</u>, No. 6:07-cv-612-Orl-19KRS, 2007 WL 4557243, at *2 (M.D. Fla. Dec. 21, 2007)(citing <u>Quintanilla v. Coral Gables Hosp., Inc.</u>, 941 So. 2d 468, 469 (Fla. 3d DCA 2006)). Additionally, the alleged injury "must be a direct result of receiving medical care or treatment by the healthcare provider." <u>Goldman v. Halifax Med. Ctr., Inc.</u>, 662 So. 2d 367, 371 (Fla.

5th DCA 1995).

If a plaintiff needs to rely on the medical negligence standard of care in proving his or her case, then the plaintiff's claim is "one for medical negligence and subject to the pre-suit and screening requirements of Florida Statute chapter 766." Corbo v. Garcia, 949 So. 2d 366, 370 (Fla. 2d DCA 2007)(holding that plaintiff could not show negligence without showing defendants were negligent in their medical treatment of plaintiff; therefore, plaintiff's claim was one for medical negligence and subject to the pre-suit screening requirements of Chapter 766).

However, a plaintiff is not barred from asserting an ordinary negligence claim as long as he or she does not rely on the medical negligence standard of care. Feifer v. Galen of Fla., Inc., 685 So. 2d 882, 885 (Fla. 2d DCA 1996); see also Quintanilla, 941 So. 2d at 470 (allowing ordinary negligence claim where plaintiff sustained injuries when nurse spilt hot tea on him and was "not injured as a direct result of receiving medical care" because "the process of serving the hot tea did not require medical skill or judgment"); Christie v. Lee Cty. Sheriff's Office, No. 2:10-cv-420-FtM-36DNF, 2011 WL 4501953, at *4 (M.D. Fla. Sept. 28, 2011)("In certain circumstances, a plaintiff may have a

16

cognizable claim for ordinary negligence in conjunction with his or her medical treatment.")(citing <u>Tenet St. Mary's Inc. v. Serratore</u>, 869 So. 2d 729, 730-31 (Fla. 4th DCA 2004)).

Under the ordinary negligence claim, the Amended Complaint lists a number of ways in which non-medical staff of Sheriff Gualtieri were allegedly negligent, including: "failing to reasonably transport [Mr. Hunt] to an emergency medical facility," "abandoning [Mr. Hunt] in a medical cell when he was clearly in medical distress and in need of emergency medical evaluation and treatment," "not summoning medical staff for further medical evaluation," "not effectively conducting the required 15 minute welfare checks while [Mr. Hunt] was in the isolation cell," and "using camera equipment that in low light conditions make it difficult or impossible to detect if an inmate is breathing and deprive the evaluator of the ability to hear the inmate and conduct two way communication." (Doc. # 1 at ¶ 114).

There is a distinction between claims based "on negligent 'diagnosis, treatment or care,' as contemplated by the medical malpractice statute, and allegations concerning the proper performance of the sheriff's custodial obligations to an inmate." <u>Darling v. Palm Beach Cty. Sheriff</u>, 2 So. 3d 368, 369 (Fla. 4th DCA 2008). In her ordinary negligence

claim, Hunt alleges that Sheriff Gualtieri's deputies were negligent in their performance of welfare checks of Mr. Hunt and in their use of a camera with a low-quality image to monitor inmates in medical isolation cells. This allegation questions Sheriff Gualtieri's performance of his custodial duties, rather than medical staff's treatment and care of Mr. Hunt. See Kelley v. Rice, 670 So. 2d 1094, 1095–97 (Fla. 2d DCA 1996)(concluding "that [plaintiff] has sufficiently asserted a cause of action for [the Sheriff's] alleged simple negligence in carrying out his custodial duties to survive a motion to dismiss" where Sheriff failed "to see that [plaintiff] was furnished medical care" while in jail).

Furthermore, Hunt alleges that Sheriff Gualtieri was negligent when deputies at the Pinellas County Jail failed to call for medical assistance for Mr. Hunt earlier, although he was visibly ill. (Doc. # 1 at ¶ 114). This claim turns on the proper performance of Sheriff Gualtieri's custodial duties, rather than medical treatment and diagnoses. The Court does not agree with Sheriff Gualtieri that "[t]he purported action or inaction of non-medical employees, specifically detention deputies, cannot form the basis for general negligence for failures to provide medical evaluations or care." (Doc. # 4 at 16). If that were the case, a detention deputy would never

18

be negligent in failing to call for medical attention for an inmate, even one who is bleeding profusely, because a decision to seek medical attention would involve "medical evaluations or care." Rather, the Court finds that the Amended Complaint "state[s] a claim for ordinary negligence in the failure to secure appropriate medical treatment for [Mr. Hunt] while [he] was incarcerated." Nobles v. Corr. Corp. of Am., No. 4:07cv288-SPM/WCS, 2008 WL 686962, at *1 (N.D. Fla. Mar. 12, 2008).

Regarding the medical negligence claim, Sheriff Gualtieri argues that Hunt has failed to allege any "facts to support [that] any medical staff 'ignored Mr. Hunt's rapidly deteriorating medical condition.'" (Doc. # 4 at 19).   Hunt alleges that Sheriff Gualtieri's medical staff, including Nurse Cruz, breached the standard of care for similar health care professionals in numerous ways, including among others: "by failing to insure that its physicians . . . were licensed," "by ignoring Mr. Hunt's rapidly deteriorating medical condition," "by failing to timely re-evaluate Mr. Hunt's medical condition and provide medical intervention in a timely manner," "by failing to call the on call physician again for further guidance, re-evaluation and/or instruction," and "by failing to transport Mr. Hunt to an

emergency room." (Doc. # 1 at ¶ 124).

The Amended Complaint alleges that Nurse Cruz failed to follow-up with Dr. Quinones regarding Mr. Hunt's medical condition one hour after administering Mr. Hunt medication as she was advised to do by Dr. Quinones. (Id. at ¶ 65). Taking all allegations in the light most favorable to Hunt, a failure to follow-up with the on-call physician regarding the medical condition of a sick patient — especially, when told to follow up by a supervisor — may fall below the applicable professional standard of care. Thus, at this juncture, Hunt has properly stated a claim that at least some actions of Sheriff Gualtieri's medical staff fell below their professional standard of care.

Therefore, Hunt's claims for ordinary negligence and medical negligence against Sheriff Gualtieri survive the motion to dismiss stage.

C. **Counts IX and X, Medical Negligence against Maxim and Dr. Quinones**

As a preliminary matter, the Court notes that Dr. Quinones is properly included as a party in this case pursuant to the Court's March 2, 2016, Order in the companion case, in which the Court granted Hunt's motion for leave to add Dr. Quinones. Hunt v. Gualtieri, Doc. # 100, No. 8:15-cv-1257-T-

20

33EAJ (M.D. Fla. Mar. 2, 2016). Therefore, the Court will analyze the medical negligence claims against Maxim and Dr. Quinones together.

A plaintiff that relies on the medical negligence standard of care in proving his or her case must comply with certain procedural requirements of Florida Statutes Chapter 766. Fassy v. Crowley, 884 So. 2d 359, 364 (Fla. 2d DCA 2004). Prior to initiating a lawsuit, the plaintiff must provide the defendant with a notice of intent to sue, Fla. Stat. § 766.106(2), and conduct a pre-suit screening, Fla. Stat. § 766.203(2). "No suit may be filed for a period of 90 days after the notice is mailed to any prospective defendant." Fla. Stat. § 766.106(3)(a). During this time, "the statute of limitations is tolled as to all potential defendants." Fla. Stat. § 766.106(4).

"If the court finds that the notice of intent to initiate litigation mailed by the claimant does not comply with the reasonable investigation requirements of ss. 766.201-212 . . ., the court shall dismiss the claim . . . ." Fla. Stat. § 766.206(2); see also Goldfarb v. Urciuoli, 858 So. 2d 397, 398-99 (Fla. 1st DCA 2003)(holding a complaint alleging medical malpractice is properly dismissed if the pre-suit requirements are not satisfied). Consequently, if a

21

plaintiff's suit is one for malpractice rather than ordinary negligence and the pre-suit requirements have not been met, a plaintiff's suit should be dismissed with leave to file an amended complaint after complying with the statutory perquisites to bringing suit. See Kukral v. Mekras, 679 So. 2d 278, 283 (Fla. 1996); S. Neurological Assocs., P.A. v. Fine, 591 So. 2d 252, 255 (Fla. 4th DCA 1991).

However, the Florida Supreme Court has advised that "the medical malpractice statutory scheme must be interpreted liberally so as not to unduly restrict a Florida citizen's constitutionally guaranteed access to the courts, while at the same time carrying out the legislative policy of screening out frivolous lawsuits and defenses." Kukral, 679 So. 2d at 284; see also Michael v. Med. Staffing Network, Inc., 947 So. 2d 614, 619 (Fla. 3d DCA 2007)(disapproving of the "increasingly disturbing trend of prospective defendants attempting to use the statutory requirements as a sword against plaintiffs").

Here, the Court previously granted Hunt leave to amend in order to comply with the pre-suit notice requirements. See Hunt v. Gualtieri, Doc. # 55, No. 8:15-cv-1257-T-33EAJ (M.D. Fla. Oct. 5, 2015). In the Amended Complaint, Hunt states that she served notices of intent on Sheriff Gualtieri on

22

December 16, 2013, "has complied with the medical malpractice pre-suit requirements" in doing so, and that the "notices of intent were sufficient to provide notice to" Maxim and Dr. Quinones. (Doc. # 1 at ¶¶ 4-7).

Maxim acknowledges that Hunt sent a notice of intent to Sheriff Gualtieri, but argues that this was not sufficient notice to Maxim. (Doc. # 3 at 12-13). Additionally, Maxim acknowledges that Hunt sent it a separate notice on August 14, 2015, before the running of the statute of limitations. (Id. at 11). However, Maxim argues that that notice was void because it omitted the ex-parte interview authorization included in Section 766.1065, Fla. Stat. (Id.). Maxim argues that the corrected notices of intent sent by Hunt to Maxim and Dr. Quinones on September 11, 2015, were untimely, and thus Hunt's medical negligence claims should be dismissed with prejudice as the statute of limitations has run. (Id. at 12).

In response, Hunt urges that the timely pre-suit notice provided to Sheriff Gualtieri was sufficient to put Maxim and Dr. Quinones on notice of her claim because of the contractual relationship between Sheriff Gualtieri and Maxim. (Doc. # 5 at 9-10); see also Michael, 947 So. 2d at 618, 621 (noting that Florida Rule of Civil Procedure 1.650(b) "provides that

notice to any prospective defendant can be imputed to those persons or entities in a legal relationship with the noticed defendant" and remanding to trial court for determination whether a sufficient legal relationship existed between hospital and defendant medical staffing company with which the hospital contracted). Hunt notes that Sheriff Gualtieri was the employer of Nurse Cruz whom Hunt also accuses of medical negligence, so Sheriff Gualtieri would qualify as a health care provider who must be given pre-suit notice. Compare Nelson v. Prison Health Servs., Inc., 991 F. Supp. 1452, 1466 (M.D. Fla. 1997)(stating that "[n]either the Sheriff in his official capacity nor the County are 'health care providers'" and thus cannot be held liable for malpractice because nurses employed by company contracting with the County committed the alleged medical negligence). Therefore, Hunt reasons, Sheriff Gualtieri was owed pre-suit notice before Hunt could bring her claim, and the timely notice Hunt gave Sheriff Gualtieri put Maxim and Dr. Quinones on notice because of Maxim's contractual relationship with Sheriff Gualtieri.

Next, even if the notice to Sheriff Gualtieri was not sufficient notice to Maxim, Hunt argues that the statute of limitations had not run by September 11, 2015, at which point

both Maxim and Dr. Quinones received the corrected notices of intent. (Doc. # 5 at 11). The pre-suit notice provided to Sheriff Gualtieri tolled the statute of limitations period for 90 days after the original expiration for all defendants, including Maxim and Dr. Quinones. See Salazar v. Coello, 154 So. 3d 430, 433 (Fla. 3d DCA 2014)("We find that the Notices of Intent received by the surgeon and the hospital . . . did toll the statute of limitations, not only as to the surgeon and hospital, but also as to all of Salazar's defendants, however denominated (and regardless of whether they received those notices or not).").

Additionally, Hunt paid a filing fee and filed a petition with the clerk of court, which automatically provides a 90 day extension that should be added to the statute of limitations period. See Fla. Stat. § 766.104(2)("Upon petition to the clerk of the court where the suit will be filed and payment to the clerk of a filing fee, not to exceed $42, an automatic 90-day extension of the statute of limitations shall be granted . . . . This period shall be in addition to other tolling periods."); see also Hillsborough Cty. Hosp. Auth. v. Coffaro, 829 So. 2d 862, 863 (Fla. 2002)(holding that "the ninety-day extension of the statute of limitations purchased under section 766.104(2) is not

added to what remains of the original statute of limitations but is added after" the extension period under section 766.106(4)). Therefore, if the running of the two year statute of limitations period started, at the earliest, on the date of Mr. Hunt's death on May 19, 2013, which Hunt disputes, the 90 day tolling period and 90 day extension added together would extend the period to November 16, 2015, by which time Hunt had served the corrected notices on Maxim and Dr. Quinones.

Even if the notice to Sheriff Gualtieri was insufficient and the statute of limitations had run between the time Hunt sent the first and second notices of intent to Maxim and Dr. Quinones, the Court finds that Hunt's medical negligence claims still should not be dismissed as she substantially complied with the statutory pre-suit notice requirements and Maxim and Dr. Quinones were not prejudiced by the inadvertent omission in the first notice. Hunt explains that the omission of the ex-parte interview authorization was a good faith error, as that language was added to the statute in 2013, and Hunt mistakenly sent a notice with the older statutory language. (Id. at 12).

Furthermore, Hunt points out that Maxim and Dr. Quinones have not conducted any ex-parte interviews with Mr. Hunt's

medical providers, even after Hunt sent them the corrected notice with authorization. (Id. at 13). Therefore, Maxim and Dr. Quinones were not prejudiced by the timely first notice's omission. Furthermore, the Court notes that Maxim has not cited any authority directly on point that states a failure to comply with the exact statutory language should result in dismissal with prejudice.

The Court finds that the first notice of intent substantially complied with the statutory requirements, the omission of the ex-parte interview authorization was a reasonable mistake, and Maxim and Quinones did not suffer any prejudice as a result of the month delay between the first notice and the second corrected notice of intent. Cf. Patry v. Capps, 633 So. 2d 9, 13 (Fla. 1994)(declining to dismiss because service was not effected by statutorily required certified mail because "receipt of written notice and lack of prejudice are conceded"); Popps v. Foltz, 806 So. 2d 583, 585 (Fla. 4th DCA 2002)(reversing dismissal because "although plaintiff did not comply after the first notice of intent, he fully complied after the second notice"); Tapia-Ruano v. Alvarez, 765 So. 2d 942, 943-44 (Fla. 3d DCA 2000)(affirming dismissal where statute of limitations had run six months before and plaintiff provided no reason for failure to comply

with the pre-suit requirements). Accordingly, the medical negligence claims should not be dismissed.

### D. <u>Count VII, Breach of Contract against Maxim, and Count VIII, General Negligence against Maxim</u>

Maxim argues that the general negligence and breach of contract claims are essentially medical malpractice claims and thus subject to the pre-suit notice requirements for such claims and duplicative of Count IX. In determining whether a claim is for general negligence or medical negligence, the question is "whether the plaintiff must rely upon the medical negligence standard of care . . . in order to prove the case." <u>Tenet S. Fla. Health Sys. v. Jackson</u>, 991 So. 2d 396, 399 (Fla. 3d DCA 2008). "In certain circumstances, a plaintiff may have a cognizable claim for ordinary negligence in conjunction with his or her medical treatment." <u>Christie</u>, 2011 WL 4501953, at *4 (citing <u>Tenet St. Mary's Inc.</u>, 869 So. 2d at 730-31).

In the Amended Complaint, Hunt states that "The Plaintiff asked Defendant Maxim if they provided medical care to the Decedent and Defendant Maxim responded that it did not provide medical care to the Decedent." (Doc. # 1 at ¶¶ 132, 137). Rather, Hunt stresses the businesses practices of Maxim, particularly its hiring and licensing of on-call

physicians for Pinellas County Jail. (Id. at ¶¶ 133, 138).
Thus, the gravamen of Hunt's claim against Maxim is that Maxim
negligently hired, oversaw, and ensured the licensure of Dr.
Quinones.

Nevertheless, the theory that Mr. Hunt's death resulted
from Maxim's failure to oversee Dr. Quinones's licensure and
treatment of inmates falls within the realm of medical
negligence. The breach of contract and ordinary negligence
claims presuppose that Mr. Hunt's death would not have
occurred if Maxim had provided a properly licensed on-call
physician to Pinellas County Jail, instead of Dr. Quinones.
Indeed, both claims assert that as "a direct and proximate
result" of Maxim's failure to provide a licensed physician,
Mr. Hunt "was caused to die." (Id. at ¶¶ 134, 139). Thus, the
ordinary negligence claim still refers back to the medical
professional standard of care by calling into question Dr.
Quinones' medical judgment and treatment of Mr. Hunt. See
Corbo, 949 So. 2d at 370 (noting that the medical negligence
standard of care applied to ordinary negligence claim because
"[plaintiff] cannot show negligence without showing that
petitioners were negligent in their medical treatment of
[plaintiff]").

The Court agrees that Hunt's claims for ordinary

29

negligence and breach of contract rely on the medical negligence professional standard of care and are duplicative of the medical negligence claim against Maxim in Count IX. See <u>Lyles v. Osceola Cty.</u>, No. 6:11-cv-1585-Orl-36DAB, 2012 WL 4052258, at *4 (M.D. Fla. Sept. 13, 2012)(dismissing claims for ordinary negligence as duplicative of medical negligence claim because those claims alleged "negligence arising out of the failure to render or the delay in rendering medical services"); <u>Christie</u>, 2011 WL 4501953, at *5 ("This conduct certainly constitutes a claim arising out of the rendering of, or the failure to render, medical care or services. As such, the Court finds Count VI is largely duplicative of Count VII. Accordingly, Plaintiff has failed to state a claim for negligence and Count VI will be dismissed."). Counts VII and VIII are accordingly dismissed.

## IV. <u>Conclusion</u>

The Court denies Sheriff Gualtieri's Motion. Additionally, the Court grants Maxim's Motion to the extent that Counts VII and VIII are dismissed, but Counts IX and X survive.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant Sheriff Bob Gualtieri's Motion to Dismiss

30

Plaintiff's Amended Complaint (Doc. # 4) is **DENIED.**

(2)   Defendant Maxim Physician Resources, LLC's Motion to Dismiss Plaintiff's Amended Complaint (Doc. # 3) is **GRANTED IN PART** and **DENIED IN PART**. Counts VII and VIII of the Amended Complaint are dismissed.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 2nd day of December, 2016.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

31